United States District Court
Southern District of Texas
**ENTERED**
June 15, 2017
David J. Bradley, Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

E.R, b/n/f
S.R. and K.R.                         §
     Plaintiffs,                §
                                §
v.                                    §     CIVIL ACTION NO. 4:16-CV-0058
                                §
SPRING BRANCH INDEPENDENT             §
SCHOOL DISTRICT,                      §
     Defendant.                 §

### MEMORANDUM AND RECOMMENDATION ON
### MOTIONS FOR SUMMARY JUDGMENT

     Pending before the court are competing motions for summary judgment filed by Spring Branch Independent School District ("SBISD") (Docket Entry # 22) and Plaintiffs, S.R. and K.R. (Docket Entry # 23).[1]   The court has considered the motions, the responses, all other relevant filings, and the applicable law.   For the reasons set out below, the court **RECOMMENDS** that SBISD's motion be **GRANTED** and that Plaintiffs' motion be **DENIED**.

### I.  CASE BACKGROUND

     Plaintiffs here bring claims under the Individuals with Disabilities Education Act ("IDEA"), § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("§ 504"), and the Americans with Disabilities Act, 42 U.S.C. §§ 12102 et seq. ("ADA"), following an unfavorable decision from the special education hearing officer in a Texas Education Agency ("TEA") proceeding.[2]   In dispute before the hearing officer were E.R.'s consolidated

---

[1] This case was referred to the undersigned magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. Docket Entry # 30.

[2] 20 U.S.C. §§ 1400-1482.

complaints that SBISD failed to provide E.R. a free appropriate public education ("FAPE") for the 2014-2015 and 2015-2016 school years.  (Transcript ("Tr.") at 1-3, 132).  E.R.'s father, S.R., and her mother, K.R., complain that SBISD removed E.R. from an elementary school where she was thriving, and moved her to a school where her academic progress stagnated. This transfer was done against their wishes, without their input, and it purportedly placed E.R.'s safety at risk, because the teachers and aides at the new school were not adequately trained to handle her serious health issues.  ("Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion") at 10).  The new school, according to Plaintiffs, offered an inferior education, because the classroom was poorly designed and located, the teacher was frequently absent with a serious health issue of her own, and there was little communication between the teacher and the parents.  (Plaintiffs' Motion at 11-15).  Plaintiffs contend that SBISD committed numerous procedural violations of the IDEA during the development of E.R.'s educational plan by moving her to this new location; by terminating some services without notice; by failing to adequately describe her progress; by failing to set clear, measurable goals; and by failing to fully describe the services she was to receive in the new setting.  (Plaintiffs' Motion at 3-5).  Plaintiffs also complain that SBISD did not provide E.R. with the full range of a general fourth grade curriculum, but instead limited her education plan to what SBISD considered to be a few "critical needs."  (Plaintiffs' Motion at 5-6).  They complain that decision discriminated against E.R. by treating her differently from her non-disabled peers, and by preventing her parents from having sufficient input into her education plan.  (*Id.*).  Because of this, they contend that they were forced to withdraw E.R. from public school and to enroll her in a private school.  (Tr. at 33, 137, Plaintiff's Original Complaint at 23)  Finally, Plaintiffs complain that SBISD was obligated to continue to prepare educational plans for E.R., even

though she had been removed from public school, and that it did not do so, in violation of the IDEA.  (Plaintiffs' Motion at 17-20).  They seek reimbursement for the tuition and expenses they have paid for E.R.'s private education.  (Complaint at 23).

## A.    E.R.'s Medical Condition

E.R. has suffered from significant and life threatening seizures all of her life, beginning within weeks of her birth, when she suffered brain damage due to a bleeding disorder.  (Tr. at 23-29, 2155, 2156).  She has had three shunts placed in her skull, to relieve the pressure on her brain.[3]  (Tr. at 2157, 2161).  These shunts can fail, or clog, at any time and cause the pressure in her brain to increase and cause additional brain damage.  (Tr. at 2161-62, 2179).  During the first several years of her life, E.R. required frequent immediate medical treatment due to seizures.  (Tr. at 2159).  E.R.'s doctors have prepared a treatment protocol that, on some occasions, can end her seizures.  (Tr. at 2163).  E.R. has a vagal nerve stimulator that works to stimulate her brain and bring her out of a seizure.[4]  (Tr. at 2163-64).  If that fails, E.R. must be given a Diastat suppository within two minutes of the onset of a seizure.[5]  (Tr. at 2163-64). The Diastat must be given at a controlled rate so that the entire dose is given successfully.  This is difficult, because E.R. fights against the delivery of the medicine.  (Tr. at 2165-2166).  For this reason, proper training in administering the treatment is critical.  (Tr. at 2166).  If these

---

[3]  A shunt is a tube or device implanted in the body to redirect fluid from one area to another.  MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY (1998) at 1489.

[4]  The stimulator is triggered by placing a magnet over a battery pack implanted in E.R.'s body.  (Tr. at 2164).

[5] Diastat is a sedative and tranquilizer used as an anticonvulsant.  MOSBY'S at 484.  S.R. described the two minute window, and the importance of administering the medication within two minutes.  (See, e.g., Tr. at 2163). However, E.R.'s Individual Health Plan includes instructions from E.R.'s doctor to administer Diastat at two minutes for seizures lasting longer than two minutes.  (Tr. at 587).

steps fail to arrest the seizure, E.R. must be taken to the hospital and heavily sedated to break the seizure process.[6]  (Tr. at 2159).

Caring for E.R. is complicated by the fact that she will sometimes experience non-convulsive seizures, during which she will show no overt physical manifestation.  (Tr. at 2159).  For much of her early life, E.R.'s seizures would occur with no warning.  (Tr. at 2160).  As she grew older and was able to communicate, her parents were able to recognize some of the warning signs of a seizure.  (Tr. at 2162).  One important predictor of an impending seizure is a change in E.R.'s affect and behavior, and so it is crucial to know and monitor her personality. (Tr. at 2162

E.R. is also said to suffer from attention deficit hyperactivity disorder.  (Tr. at 2179, 1840).  She cannot stay on task, and is easily distracted.  (Tr. at 2179-80).  Her concentration and ability to learn are also negatively affected by the medications she takes to control her seizures.  (Tr. at 36, 2171, 510, 512, 521).  Her inability to stay on task makes it difficult to measure the true level of her intellectual disability, because she is not able to focus on assessment tests.  (Tr. at 2180-2181).

**B.  E.R.'s School**

    **1.  Wilchester Elementary School**

E.R. was enrolled in the first grade at Wilchester Elementary School, in the Spring Branch Independent School District, for the 2011-2012 school year.[7]  (Tr. at 2185, 441).  SBISD created an Admission, Review and Dismissal Committee ("ARDC") to determine "whether [E.R.] is a child with a disability [who] needs special education and related services,"

---

[6]  S.R. described it as a "near coma" state.  (Tr. at 2159).

[7]  E.R. completed kindergarten the previous year in Miami, Florida.  (Tr. at 447, 1840).

and the level of those services.[8]  (Tr. at 441).  A Licensed Specialist in School Psychology and

a Speech Language Pathologist completed a Full and Individual Evaluation ("FIE") of E.R. on

September 28, 2011.  (Tr. at 441-458).  As part of that evaluation, they reviewed information

from E.R.'s placement in the Miami-Dade public school system, a psycho-educational

evaluation done by Judith Siskind, Ph.d in Miami, and they also tested her in numerous areas.[9]

(Tr. at 442).  She was found to have deficits in her visual-motor functioning and language

skills.[10]  (Tr. at 443-447).  It was pointed out, several times, that she was easily distracted from

tasks, and had trouble following the teacher's directions.  (Tr. at 447).  Most of the time, it was

necessary to have an adult sit on each side of E.R. to keep her focused on the assessment test.

(Tr. at 442).  She was also found to have below average intellectual functioning, with a full

scale IQ score of 51.  (*Id.*).  The low score, it was cautioned, might have been the result of a

lack of effort, or because of her easy distractibility, and so that test might not have reflected her

actual intellectual ability.  (Tr. at 442, 452, 455).  She did not show any deficits in adaptive

behavior, so she was not deemed to have a cognitive impairment.  (Tr. at 455).  She did,

however, meet the criteria for "other health impairment," because of her seizures and the

ADHD.  She also met the state and federal special education criteria for a speech impairment.

---

[8]  In Texas, the ARDC is charged with preparing a student's individualized education program, which is a written
statement of the disabled child's present level of academic achievement, measurable annual educational goals, and
special education, related services, and other accommodations to be provided to the child.  *See* 20 U.S.C. §
1414(d)(1)(A);  *R.H. v. Plano Ind. Sch. Dist.*, 607 F.3d 1003, 1008 (5th Cir. 2010), *cert denied*, 562 U.S. 1216, 131
S. Ct. 1471 (2011).  The ARDC is composed of the disabled child's parent(s), at least one special education
teacher and/or one regular education teacher, a representative of the school district, someone who can provide
insight into the instructional implications of the child's clinical evaluation, and, when appropriate, other
individuals with special knowledge or expertise related to the child and the child.  *See* 20 U.S.C. § 1414(d)(1)(B);
*Adam J. ex rel. Robert J. v. Keller Ind. Sch. Dist.*, 328 F.3d 804, 808 (5th Cir. 2003).

[9]  Dr. Siskind believed E.R. would "need closely supervised learning experiences in a specialized educational
setting geared to students with significant learning disabilities."  (Tr. at 1846).  E.R. would also need a lower level
placement with a low student to teacher ratio.  (Tr. at 1846).

[10]  E.R.'s age equivalent skills were two to four years below her real age in the three categories tested.  (Tr. at
443).

(Tr. at 455-456).  A Behavior Intervention Plan ("BIP"), to help her remain on task and comply with the teacher's requests, was recommended.  (Tr. at 447, 457).

For the 2011-2012 and 2012-2013 school years (her first and second grade years), E.R. attended the Life Skills class at Wilchester Elementary, and her assigned teacher was Cheryl Patterson.  (See Tr. at 2200).  Even though she had significant medical problems, E.R. did well in school, and her parents saw that she was making progress.  (Tr. at 2194).  E.R.'s second grade education was directed by an IEP that ran from May 9, 2012 to May 8, 2013.[11]  (Tr. at 1798).  This IEP set out 25 specific goals in academics, speech, and classroom behavior.  (Tr. at 1798).  E.R. mastered 21 of her goals, but required continued monitoring in three of the areas that she mastered.  (Tr. at 1798-1815).  She failed to master four of the goals, including to stay on task without prompting.  (*Id.*).

An ARDC meeting took place on May 1, 2013, to develop the IEP for the next school year.  (Tr. at 2196-97, 1355).  Although she would be entering the third grade, E.R. was still far behind academically.  (Tr. at 1361-1363).  She read at a kindergarten level, and was not able to understand grade level materials in any subject.  (Tr. at 1363).  The IEP set out various goals for the upcoming school year.  For the 2013-2014 school year, E.R.'s math, social studies, and language arts instruction were completed in the Life Skills Classroom, while science and special classes took place in the general educational setting.[12]  (Tr. at 1393, 2199).  This was a change from the previous year when she received math instruction in the general educational setting and science in the Life Skills classroom.  (*Id.*).

---

[11]  This IEP covers the last month of E.R.'s year in first grade, and all but the last month of E.R.'s year in second grade.  As such, it overlaps the school years.  (*See,* Tr. at 566).  There is no explanation for why the IEP overlapped school years.

[12]  These classes include art, music, and other fine arts classes.

A functional behavior assessment was completed at that time to address two problems that interfered with her ability to learn.  (Tr. at 1374).  E.R. had frequent trouble staying on task, and she did not greet adults or peers.  (Tr. at 1374).  A behavioral intervention plan was implemented to address these issues.  (Tr. at 1380).  All involved agreed that E.R. would receive Speech Language Therapy, Personal Care Services, Health Services, Adaptive Physical Education, and Occupational Therapy, in addition to the educational instruction.  (Tr. at 1393, 1395).  Everyone present at the ARDC agreed to the terms of the IEP.[13]  (Tr. at 1397).

Nicki Shields replaced Cheryl Patterson as the special education teacher in the Life Skills class at Wilchester for the 2013-2014 school year.  (Tr. at 2200).  Despite the change, E.R.'s parents saw continued progress in her development during the third grade year.  (Tr. at 2200).  Although they were upset that she was excluded from some school-wide activities, they believed it was a positive year, overall.  (Tr. at 2200-2201).  By the end of that year, E.R. was able to recognize safety signs, classify objects by state of matter, add and subtract simple numbers, and tell time in hour and half-hour increments.  These were listed as strengths on the next year's IEP.  (Tr. at 403-404).  She read below grade level texts that were adapted for her, and still required a focus on increasing her vocabulary so that she could read and understand texts without help.  (Tr. at 403).

E.R.'s parents attended the annual ARDC Meeting, on April 24, 2014.[14]  (Tr. at 402). After reviewing the existing evaluation data, and E.R's. current level of performance, the committee set goals for the following year.  (Tr. at 430, 404).  In Language Arts, E.R. was assigned the goals to write five words using appropriate size and spacing on lined worksheets,

---

[13]  Although S.R. testified that he was at this meeting, the notes indicate he participated by telephone.  (Tr. at 2197, 1397).

[14]  The IDEA requires an ARDC to review each IEP annually.   See, 20 U.S.C. 1414(d)(4)(A)(i).

to identify the main idea of a reading, and to give two supporting details, and to read a paragraph without assistance.   (Tr. at 406-408).   Her Math goals included addition and subtraction up to one hundred, and telling time in fifteen minute increments.[15]  (Tr. at 409-410). In Science, E.R. was to participate in, or observe, a science experiment and to answer two questions about her observations.  (Tr. at 411).  For Social Studies, E.R. was to understand the definition of five grade-level words from class.  (Tr. at 4112).  Although E.R. still struggled with greeting others and staying on task, it was decided that she no longer required a Behavior Intervention Plan.  (Tr. at 415-416).  E.R. was also removed from the general education science class and, at that time, received all math, science, social studies and language arts instruction in the Life Skills Classroom.  She then attended fine arts only in the general education setting. (Tr. at 424).  E.R. was also removed from the reading resources program, because it was not deemed effective for her.[16]   (Tr. at 2205).   In exchange, her parents asked that her speech therapy be increased.  That request was declined, however, because E.R. could meet her speech goals with the current levels of service.  (Tr. at 2205, 427).  E.R.'s parents signed the IEP.  (Tr. at 428).

### 2.  Transfer to Frostwood

Although not reflected in the report, or the minutes, from the April 24, 2014 ARDC meeting, E.R.'s parents learned that Frostwood Elementary school might open a Life Skills program.  (Tr. at 2203).  They also discovered, as well, that the special education teacher, Ms.

---

[15]  Telling time in fifteen minute increments was a goal for E.R. for second grade and at the end of that year she still needed prompts for forty five minutes.  It was not a goal for her third grade year, but was brought back for the fourth grade year.  (Tr. at 403, 410, 1361, 1369-1370).

[16] The only explanation for E.R.'s removal from "reading resources" was that it was not "efficacious" for her.  (Tr. at 2206).  This is similar to the explanation given for her removal from the general education science class, that she could not keep up with the rest of the class.  (Tr. at 2444).

Shields, was leaving Wilchester.  (Tr. at 2203-2204).  S.R. asked the committee about the possibility of. E.R. moving to Frostwood.[17]  (Tr. at 2204).  He was assured that the committee expected her to remain at Wilchester the following year.  (Tr. at 2205).

However, a week after that ARDC meeting, Tiffany Mathis, the special education coordinator for SBISD, informed S.R. that, in fact, E.R. might be moved to Frostwood.  (Tr. at 1100, 1909, 2712).  On May 5, 2014, S.R. sent a three page letter to Ms. Mathis and to Deborah Darmer, the director of Special Education for SBISD, expressing concern about any proposed move.  (Tr. at 1908-1910).  S.R. explained that, in light of E.R.'s complex medical condition, her safety was his primary concern.  (Tr. at 1909).  E.R. could suffer a seizure or shunt failure at any time, without warning, and so it was critical that those around her be familiar with her personality, affect and demeanor.  (*Id.*).  S.R. explained that doctors were about to reduce her anti-epileptic medications, so the next year was to be a particularly sensitive time.  (*Id.*).  He asked that SBISD carefully consider whether placing E.R. in a new environment, with new teachers, in a new program, was appropriate in light of these health risks.  (*Id.*).  S.R. also stated that it was essential that someone from Wilchester be assigned to Frostwood "so that at least one member of the teaching staff is already familiar with E.R."  (*Id.*).  He explained that he was not opposing a move, but did expect that "a careful analysis" by the district, which involved "all requisite teaching, medical and administrative personnel," with a consultation with him, to ensure that a safe and appropriate placement took place.  (Tr. at 1910).

After receiving this letter, SBISD confirmed that the decision to move E.R. to Frostwood was final.  (Tr. at 2715-2716).  To address S.R.'s concerns, Mahnaaz Firozgary, a

---

[17]  Frostwood is E.R.'s "home school" and is the closest to her home address.  It is the school E.R. would normally attend.  She was placed at Wilchester because Frostwood did not have a Life Skills class at the time of her enrollment in SBISD.  (Tr. at 1394).

paraprofessional, was transferred from Wilchester to Frostwood.[18]   (Tr. at 2716).   Ms.
Firozgary was well known to E.R.'s family, had occasionally babysat for the child, and was
trusted by her parents.  (Tr. at 2189, 2219-2220, 2229-2230).  Ms. Mathis called S.R. on May
19, 2014, to tell him that his daughter was being moved to Frostwood, and that Ms. Firozgary
was coming with her.  (Tr. at 2220).  After their conversation, S.R. emailed Ms. Mathis to say
that "it brings a lot of relief to know that Mahnaaz will be joining E.R. at Frostwood."  (Tr. at
1911).  S.R. expected someone from Frostwood to meet with him so that he could explain
E.R.'s health situation to the staff and train them on her seizure protocol.[19]   (Tr. 2221).
Frostwood held a luncheon in June for the Life Skills students to meet their teacher Juliette
Pye, but Plaintiffs were unable to attend.  (Tr. at 2769, 2222-2223).

### 3.  Frostwood Elementary

Shortly before school started in the fall, Frostwood held an open house to allow parents
to see the new campus and meet the teachers.  (Tr. at 2224-2225).  S.R. was not impressed.
(Tr. at 2225-2229).  He realized, for the first time, that the Life Skills classroom was on the
opposite side of the building from the nurse's station.  (Tr. at 2226).  S.R. described the room
as sterile and bland, lacking color or visual stimulation.   (*Id.*).   The toilet in the attached
bathroom was covered in urine, and S.R. offered to clean it up.[20]  (*Id.*).  According to S.R., the
other classroom paraprofessional, Mr. Pineda, stared at the ground and did not appear to be
interested in learning about E.R.'s needs.  (Tr. at 2227).

---

[18]  A paraprofessional is an employee of a local education agency who provides instructional support.  See, TEA
website at
http://tea.texas.gov/About_TEA/Laws_and_Rules/NCLB_and_ESEA/Highly_Qualified_Teachers/Requirements_f
or_Highly_Qualified_Paraprofessionals/

[19]  S.R. testified that he had a number of meetings with the staff at Wilchester to explain E.R.'s medical needs and
expected the same at Frostwood.  (Tr. at 2186).

[20]  S.R.'s testimony is the only evidence of this incident.

S.R. spoke with Juliette Pye, the teacher, during this visit, and tried to explain E.R.'s health issues, but constant disruptions prevented a meaningful discussion.  (Tr. at 2227).  Ms. Pye told him that she wanted E.R. dropped off with the rest of the children in the carpool line, to help her develop independence by walking to the classroom without her parents.  (Tr. at 2665, 2227).  This upset S.R., because walking his daughter to class allowed him to update the teacher on E.R.'s health and attitude that day.[21]  (Tr. at 2228, 2923).  He left with the conviction that the Life Skills class at Frostwood was not ready for the start of the school year.  (Tr. at 2227, 2231).

S.R. then met with Ellen Green, the Principal of Frostwood, on Friday, September 5, 2014, to discuss Ms. Pye's drop off procedure.[22]  (Tr. at 2235, 1850).  He believed it was unsafe for E.R. to be in the regular car pool line because she does not recognize dangerous situations.  (Tr. at 2235-2236).  He proposed that the school move the drop off location for the children in the Life Skills class to an area with less traffic.  (Tr. at 2236).  Ms. Green changed the location that day, and informed everyone of the new procedure.  (Tr. at 1850, 2665).  Ms. Green proposed a meeting for the following Monday to obtain a "better understanding of E.R. and her needs."  (Tr. at 1850-1851, 2665).

E.R.'s parents met with Principal Green, Ms. Pye, Ms. Mathis, a diagnostician from the school, a speech language pathologist, and the school nurse, Nancy Musgrove, on September 8, 2014.  (Tr. at 1112, 1116-1117).  S.R. testified that he complained, at this meeting, about the lack of communication from the school and the teacher.  (See., e.g., Tr. at 2368, 1867).  At the time of the meeting, only Ms. Firozgary and Nurse Musgrove had been trained to treat E.R. if

---

[21]  S.R. described it as a punch to the gut.  (Tr. at 2230).

[22]  There is no evidence that S.R. expressed his concern about the drop off procedure directly to Ms. Pye.

she had a seizure.  (Tr. at 571).  A week after this meeting, Nurse Musgrove trained all of the staff in the Life Skills classroom, the three teachers in the resource room next door, and E.R.'s speech teacher, on how to respond in the event of a seizure and on how to administer Diastat.  (Tr. at 2873).  Nurse Musgrove believed this training was sufficient.  (Tr. at 2869-2870).

E.R.'s parents believed that her science instruction would take place in the general education classroom setting with the fourth grade class, as it had been the previous year at Wilchester.  (Tr. at 1849).  When Ms. Pye told them, on August 28, 2014, that E.R. was not receiving academic instruction with the mainstream fourth grade class, S.R. thanked her and told her that E.R. was off to a great start.  (Tr. at 1849)

At approximately the same time, Ms. Pye recognized a problem with the IEP.  (Tr. at 2656).  Because of her familiarity with E.R., Ms. Firozgary told Ms. Pye that the child required one to one assistance at all times, and that she was to be accompanied when she left the classroom.  (Tr. at 2656).  Ms. Pye called Wilchester to confirm that protocol, even though the IEP did not require it.  (Tr. at 395, 2656)  The IEP was then amended to show that E.R. would be accompanied at all times, effective September 15, 2014.  (Tr. at 395).  According to Ms. Pye, that change did not affect the classroom, because E.R. was always accompanied by an adult from the first day of school.  (Tr. at 2656-2657).

S.R. believed that Ms. Firozgary had been transferred to Frostwood specifically to accompany E.R. at all times.[23]  (Tr. at 579, 2233).  However, on October 8, 2014, he learned that Mr. Pineda took E.R. outside for recess.  (Tr. at 579).  S.R. emailed Ms. Pye and told her that it was a "breach of trust" to let anyone other than Ms. Firozgary supervise his daughter outside of the classroom.  (Tr. at 579).  He explained that he had told Principal Green that if

---

[23] Principal Green said that she did not remember that to be the case, but, would not dispute it.  (Tr. at 1106) ("I don't recall being told that she was specifically for E.R., but I would accept it if she was.").  S.R. insists he spoke with Principal Green and "knew she understood" that to be the case.  (Tr. at 579, 2233).

Ms. Firozgary had not been moved with E.R., he would have stopped the transfer to Frostwood. (Tr. 579).  He asked Ms. Pye to ensure that only Ms. Firozgary accompanied E.R. out of the classroom, and stated that if Ms. Firozgary was absent, E.R. would stay home.  (Tr. at 579, 2256).  S.R. contended that Mr. Pineda was not competent to care for E.R., and that if she was injured under his care, it would be inexcusable.  (Tr. at 579).  Ms. Pye responded the same day, assuring S.R. that if Ms. Firozgary was not able to be with E.R. outside of the classroom, Ms. Pye would adjust the schedule, or keep E.R. in the Life Skills classroom.  (Tr. at 1869).  In response, S.R. underscored his trust in Ms. Firozgary, and his lack of faith in Mr. Pineda's ability to understand E.R.'s needs.  (*Id.*).  Ms. Pye testified that this accommodation made scheduling difficult, because of the needs of the other students in the classroom.  (Tr. at 1872, 2670).

### 4.  Shunt Failure at Frostwood

On October 14, 2014, E.R. experienced a medical emergency while at school.  (Tr. at 2246).  She was very lethargic throughout the day, and according to Ms. Pye, Ms. Firozgary was not concerned because E.R. has trouble sleeping at night.  (*Id.*).  Ms. Pye became more concerned later that day when E.R. complained of neck pain and she took her to the nurse.  (*Id.*).  The substitute nurse wanted to monitor E.R., but Ms. Pye insisted on calling her mother.  (*Id.*).  E.R. was taken to Texas Children's Hospital and the doctors determined that she had experienced a shunt failure, and she was hospitalized for several days.  (*Id.*).  S.R. argued that this incident shows how ill prepared Ms. Pye was to care for E.R.  (Tr. at 581-582).  He insists that it was Ms. Firozgary who saved E.R.'s life, because Ms. Pye mistakenly believed E.R.'s symptoms were "behavioral problems."  (Tr. at 582).

E.R. returned to school the following week.  On Monday, October 20, Ms. Pye informed E.R.'s parents that Ms. Firozgary would be absent the next day.  (Tr. at 1876).  S.R. stated that he was "totally fine" with E.R. attending school, so long as Ms. Pye was in direct supervision of her at all times.  E.R. went to school even though Ms. Firozgary was absent. (Tr. at 1876-1879).

### 5.  October 27, 2014 Meeting

During October, S.R. contacted Janet Teater to express his concerns about the Life Skills class at Frostwood, particularly Ms. Pye's expected absences.[24]  (Tr. at 1880, 2623). S.R. criticized the staff as "insufficient and inexperienced," and said that the school was putting the children at risk.  (Tr. at 1881).  "Had I ever know what was to transpire when I agreed with Tiffany Mathis that I would conditionally permit [E.R.'s] transfer to Frostwood in light of the concurrent transfer of Mahnaaz," he said, "I would have proceeded with the filing of the suit I had already prepared for when I was still in the dark concerning the District's intentions."  (Tr. at 1880).  He explained that he was "reaching a point at which [he would] likely commence litigation against the District," and would "act with unimpeded professional aggressiveness" to protect his daughter.  (Tr. at 1880).  It was only because Ms. Firozgary accompanied E.R. that he had not already removed her from Frostwood.  (Tr. at 1880).  If the District did not provide immediate attention, he cautioned, he would force the issue through the court process.  (Tr. at 1881).

The same day, Ms. Teater spoke with Principal Green, discussed the staffing issue and Ms. Pye's absences, and replied to S.R. that Frostwood had a plan in place to have a certified, degreed special educator in the room to meet the children's needs at all times.  (Tr. at 1880).

---

[24]  Ms. Pye experienced dizzy spells the previous year and those spells increased and worsened when school resumed in the fall, forcing her to seek medical treatment and miss work.  (Tr. at 2644).

She then called him to discuss his concerns.  During this call, S.R. described the Life Skills classroom as "a mess," with no staffing and no nurses nearby.  (Tr. at 1400).  He did not believe the Frostwood program was ready, and he was upset that no one at Frostwood had discussed E.R.'s health problems with him.  (*Id.*).  He said that Mr. Pineda did not like children, and should not be in the classroom.  (*Id.*).  He claimed that he did not know the names of E.R.'s teachers and questioned whether the paraprofessionals had been trained to handle her seizures.  (Tr. at 1400).  He said that Ms. Pye was frequently absent, creating a lack of consistency in the classroom.[25]  (Tr. at 1400).  He characterized the move from Wilchester as "completely mishandled."  (Tr. at 1400).  Ms. Teater's notes from the call show that he talked about filing a lawsuit because of these perceived health and safety issues.  (Tr. at 1400).

Ms. Teater visited Frostwood Elementary the next day and observed the Life Skills classroom.  (Tr. at 2625).  She reported to S.R. that she thought the classroom looked good, but that an instructional facilitator would also visit the classroom to observe.  (Tr. at 1882).  In addition, Principal Green was to speak with him, and the other parents, about their concerns.  (Tr. at 1882).  S.R. responded that he was still unhappy with the lack of consistency.  (Tr. at 1882).  He complained that E.R. was comfortable at Wilchester, but was forced to move to a class with only three students.[26]  (Tr. at 1882).  He expressed concern about the location of the classroom in relation to the nurse's office and thought that a meeting with all of the parents was appropriate.  (Tr. at 1882).

---

[25]  There are conflicting statements on how often Ms. Pye was absent.  Ms. Firozgary testified that Ms. Pye missed more than twenty days between the start of school and December 20, 2014, and that she was absent frequently at the beginning of the school year.  (Tr. at 2480).  Jan Teater believed she was absent about three days over the first thirty days of school.  (Tr. at 913).  Principal Green said that, by mid-November, Ms. Pye had been absent about eight times.  (Tr. at 1119).  Ms. Pye estimated that she was absent fifteen times during the fall semester, but said that some of the absences were district-related, and not every absence was for the entire day.  (Tr. at 2685-2686).

[26]  A fourth student joined the class after the school year started.

Principal Green and Ms. Teater met with all of the parents on October 27, 2014.  (Tr. at 2250).  According to Principal Green, it had become clear, by that time, that Ms. Pye would be ill for an extended period of time and so she wanted to explain to the parents how the school would handle her absences.[27]  (Tr. at 1121).  According to S.R., all of the parents complained that there was a lack of consistency, that they had no information about the class, and that the children were regressing in their skills.  (Tr. at 2251).  S.R. said that one parent reported that a student was hit on the wrist by a teacher, while another parent complained about Ms. Pye's temper.[28]  (Tr. at 2252).  S.R. testified that all of the parents begged Ms. Teater to return the students to their previous schools.[29]  (Tr. at 2252).  S.R. expected a call the next day telling him that E.R. was moving back to Wilchester.  (Tr. at 2254).  Instead, on November 5, 2014, Ms. Teater told him that the program was going to continue at Frostwood.  (Tr. at 2255).  S.R. was unhappy, and said that he would likely begin litigation against the District.  (Tr. at 2632).

Ms. Teater's decision relied, in part, on the report from Vicki Cole, a special education facilitator, who observed the Life Skills classroom.  (Tr. at 2627).  Ms. Cole made some minor recommendations to Ms. Pye about using additional visual supports, but overall, she told Ms.

---

[27]  There is testimony that Ms. Pye tried to minimize the disruption to the class during her absence by informing the parents and district when she would be absent, and preparing binders with work materials for each student. (Tr. at 2644,  2781, 1872, 2644-2645).  Vicki Cole, a special education facilitator, covered Ms. Pye's class on several occasions until Frostwood settled on a plan to have the resource teachers from the next room, including Linda Standefer, fill in when Ms. Pye was absent.  (Tr. at 2895, 2909).  Although S.R. believed the absences were detrimental to E.R.'s progress, employees of SBISD did not.  (See testimony of Ms. Standefer, Ms. Pye, and Principal Green, Tr. at 2909, 2645, 2780-2781).

[28]  Ms. Firozgary testified that she received a phone call from a parent complaining that her son was slapped at school.  (Tr. at 2467-2469).  Ms. Firozgary did not see it happen and it is not clear from her testimony if she believes it did actually happen.  Ms. Firozgary also testified that Ms. Pye yelled at E.R., loudly enough that a teacher from next door came running in.  (Tr. at 2470).  Ms. Pye testified she "roared" like a lion, to show E.R. what sound a lion makes.  (Tr. at 2647).  Ms. Standefer, the teacher next door, confirmed that everyone was laughing when she arrived.  (Tr. at 2912-2913).

[29]  Principal Green testified the other parents retreated from their demands that their children be transferred and apologized.  (Tr. at 2800-2801).  S.R. contends that those apologies were made only to protect siblings who were still in SBISD.  (Tr. at 2925).

Teater that the instruction in the classroom was appropriate.  (Tr. at 2627, 2904).  Ms. Teater also asked Jean Hall and Linda Floyd to review the progress of all of the children in the Life Skills class.  (Tr. at 2630).  Ms. Hall reviewed the work portfolios compiled by Ms. Pye for each student and concluded that E.R. was making satisfactory progress toward completing the goals in her IEP.  (Tr. at 2725-2726).  Ms. Teater's impression from these reports was that the students in the Life Skills Program were learning, and that the instruction was appropriate, despite S.R.'s complaints.  (Tr. at 2632).

### 6.  December 10, 2014 ARDC Meeting

On November 25, 2014, S.R. requested an ARDC meeting to review E.R.'s progress in school.  (Tr. at 1895).  He asked for documentation of her progress on each of the nineteen goals listed on the IEP.  (Tr. at 1895-1896).  To prepare for the ARDC, Ms. Pye updated E.R.'s Present Levels of Academic Achievement and Functional Performance ("PLAAFP") so that the committee could assess her progress in class, and to set new goals, if appropriate.  (Tr. at 2660, 1955-1956).  Ms. Pye saw progress in each area for E.R.  (Tr. at 2660-2662).  E.R.'s writing had improved, and she had moved from a kindergarten to first grade reading level.  (*Id.*).

The ARDC meeting took place on December 10, 2014, and was recorded by both sides. (Tr. at 2259).  S.R. was given the opportunity to speak first and he spoke for over an hour.  (See exhibit 6, audio recording of meeting).  He pointed out that the April 24, 2014 IEP listed Wilchester as the location of services and the transfer between the schools was done without his input and without an ARDC meeting.  (Exhibit 6 at 4:10-5:00).  He believed that the staff at Frostwood did not know E.R. well enough to protect her in light of her critical health impairments.  (Ex. 6 at 10:00-11:30, 8:15-8:45).  He complained that the classroom was too far away from the nurse's station for his comfort.  (*Id*).  He did not believe that Mr. Pineda was

engaged with the students or qualified to care for E.R., and he did not feel comfortable sending his daughter to school if Ms. Firozgary was absent.  (*Id*. at 8:00-10:24).  He complained that there was no information on E.R.'s progress in speech therapy or occupational therapy.[30]  (*Id.* at 14:00-17:00).  When E.R. was at Wilchester, S.R. was accustomed to regular reports from the occupational therapy teacher, and he expected the same from Frostwood.  (*Id* at 21:45-22:30).  He felt that E.R. had regressed, and it was because the program was not ready for someone with E.R.'s health conditions.  (*Id*. at 25:00-27:00).  S.R. did not believe the class size was appropriate, because E.R. was not able to socialize enough with her peers.  (*Id*. at 47:00-49:00).  Finally, he believed that Ms. Pye was unprepared to teach the class, and that she did not use appropriate teaching materials.  (*Id.* at 1:07:00-1:09:00).

When asked what he wanted, S.R. identified two things.  (*Id.* at 58:00-60:00).  First, he demanded more engagement and better communication from the school, including an analysis of the teacher's absences, and how that affected E.R.  (*Id.* at 58:00-59:00).  He also wanted the district to keep open the option of moving E.R., and to acknowledge that it had been a mistake to move her to Frostwood.  (*Id.* at 59:00-60:00).  But, he said, as long as the district refused to acknowledge this was a mistake, he was going to make the district "learn a lesson."  (*Id.*).  S.R. conceded that he was not demanding that the location of the Life Skills class room be moved, but he wanted to be part of the discussion about whether it was safe for his daughter with the current arrangement.  (*Id.* at 1:06:00-1:08:00; 1:09:00).  SBISD's attorney assured S.R. that the staff would put together a plan to address his concerns, the attorney would determine if a

---

[30]  Ms. Pye testified that, due in part to a change in the computer program used, she inadvertently omitted the speech therapy progress report when she first printed the IEP progress report.  (Tr. at 2667).  When S.R. complained about the missing information at the ARDC meeting, she realized the error, printed it and provided it to E.R.'s parents.  (Tr. at 2667).  SBISD told S.R., at the ARDC meeting, that the occupational therapy reporting was only done once per year, but that the older method of reporting (from Wilchester) included observations from the teacher making that school appear to have more frequent reporting.  (*See, general discussion*, Ex. 6 at 59:00-1:02:00).

transfer was possible, and he would respond to S.R.  (*Id.* at 1:04:00, Tr. at 388).  Notably, S.R. did not complain about the substance of the IEP or its goals, only that he did not feel as if he was receiving sufficient information from the school on E.R.'s progress.  (*Id.* at 41:00-50:00). Although Ms. Pye had prepared a summary of E.R.'s progress to that point, as requested by S.R., it was not discussed in the meeting, nor was it given to him.  (Tr. at 2679-2680).

### 7.  Winter Break

Two days after the ARDC meeting, Juliette Pye resigned.  (Tr. at 2793-2794).  Principal Green informed the parents of Ms. Pye's resignation the following week, just days before the winter break began.  (Tr. at 1153, 2794, 2264).  S.R. assumed that SBISD would close the Frostwood class, and return the children to their previous schools, because Principal Green admitted that it would be difficult to find a replacement during the winter break.  (Tr. at 2264-2265).  Instead, Principal Green arranged for a retired Life Skills teacher to teach the first week of classes while the search for a permanent replacement continued.  (Tr. at 2795).

On January 5, 2015, the day before classes resumed, S.R. sent a letter to Ms. Teater and Deborah Darmer.  (Tr. at 580).  He expressed his frustration that SBISD had not responded to the complaints he voiced in the December ARDC meeting.  (Tr. at 580-582).  He insisted that the Frostwood classroom was unsafe, that the students were regressing, and that SBISD refused to admit fault or correct any problems.  (Tr. at 581).  He complained that Ms. Pye and Mr. Pineda were too inexperienced and disengaged to provide for the needs of the children in the classroom, and said that he trusted only Ms. Firozgary.  (Tr. at 581).  He repeated his complaints from the ARDC meeting that the reporting was inadequate, and that the location of the classroom was a safety issue for his daughter.  (Tr. at 581).  According to S.R., Ms. Pye's resignation had exacerbated the situation, and the program was an utter failure.  (Tr. at 582).

He said that he was filing a complaint and a request for an investigation with the TEA.  (Tr. at 582).

Despite this letter, E.R. attended Frostwood for the first week of the spring semester. (Tr. at 2266-2267).  According to S.R., the substitute teacher was experienced, but she was only there for the first week and so added to the lack of continuity in E.R.'s teaching.  (Tr. at 2267).  On January 11, 2015, S.R. emailed Ms. Teater, Ms. Darmer, Principal Green, and the attorney for SBISD telling them to remove E.R. from the student rolls of SBISD.  (Tr. at 583).

**8.  E.R.'s Transfer to the Tuttle School at Briarwood**

E.R. then moved to the Tuttle School at Briarwood ("Briarwood"), a private, tuition based school, on January 12, 2015, to complete the spring term.  (Tr. at 2274, 1793).  On March 29, 2015, S.R. renewed the contract with Briarwood for the following school year.  (Tr. at 2275, 1298).  Although S.R. described the move to Briarwood as an "emergency," K.R. had completed the application for E.R.'s admittance on November 19, 2014.  (Tr. at 2273, 1931). On December 4, 2014, the week before the ARDC meeting, S.R. and K.R. visited Briarwood to meet the teachers and to see which class would be appropriate for E.R.  (Tr. at 1933, 2273). S.R. expressed his hope, at that time, that they would become "part of the Briarwood family." (Tr. at 1933).  E.R. visited Briarwood, again, on January 8, 2015, to evaluate how she would adjust to the classroom, and to the other students, before joining the class the following week. (Tr. at 1934, 1936).  On January 16, 2015, S.R. provided written notice to SBISD that they were placing E.R. at Briarwood, because SBISD did not provide her with a free appropriate public education.  (Tr. at 557).  S.R. stated that the lack of a qualified teaching staff, and the failure to comply with E.R.'s IEPs, caused her to regress and placed her health at risk.  (Tr. at 557).

On July 25, 2015, S.R., through his attorney, gave SBISD notice that E.R. would be placed in Briarwood for the 2015-2016 school year, because there was no IEP in place after April 2015, in violation of her right to a FAPE.  (Tr. at 561).  SBISD responded that it understood his prior actions to be an unequivocal rejection of public services, however, it would broadly interpret the July 25, 2015 due process notice as a request for an ARDC meeting, and it scheduled a meeting for August 20, 2015.  (Tr. at 2019, 2049-2082).

SBISD proposed an IEP for the 2015-2016 school year at that meeting.  The IEP set goals similar to those presented in the prior IEP to allow the school time to assess E.R.'s current status and, to determine if there was any regression while she was at Briarwood.  (Tr. at 2071).  S.R. and K.R. were accompanied at the meeting by their attorney.  (Tr. at 2072).  Their attorney explained to the committee that the IEP did not cover each of the Texas Essential Knowledge and Skills ("TEKS") for her grade level, and so he believed it was inadequate and discriminatory.  (Tr. at 2072).  S.R. provided a written objection to the IEP on these grounds. (Tr. at 2082).  E.R. remained at Briarwood for the 2015-2016 school year.

## II  DUE PROCESS HEARING AND HEARING OFFICER'S DECISION

On February 12, 2015, Plaintiffs filed a Request for a Due Process Hearing.  (Tr. at 27-34). Plaintiffs complained that SBISD failed to provide E.R. with a free appropriate public education for the 2014-2015 school year, because it:

> (1) did not implement appropriate academic goals and objectives meeting with the state standards in all subjects resulting in inadequate IEPs;
>
> (2) did not have appropriate functional goals;
>
> (3) did not have appropriate socialization and behavioral goals;
>
> (4) did not identify the nature, type and frequency of the related services of occupational therapy and speech therapy and that failure prevented the parents from the opportunity to participate in the decision making process;

(5) did not convene an ARD meeting to evaluate and discuss the transfer from
Wilchester to Frostwood;

(6) did not include in-class support when she attended general education
curriculum and did not provide for aide support when moving about the school
for lunch and recess;

(7) impeded the parents opportunity to participate in the decision making
process when it failed to hold the meeting promised by SBISD prior to making a
decision to transfer E.R. to Frostwood;

(8) impeded the opportunity to participate in the decision making process when
it did not follow up on the December 10, 2014 ARDC meeting;

(9) did not account for E.R.'s health issues when assigning her to a classroom
located far from the nurse's station; and

(10) did not ensure the staff was properly trained to meet E.R.'s health needs,
including making sure the health plan was appropriate and up to date.

Plaintiffs requested a finding that E.R. had been denied a FAPE, and that Briarwood School is

an appropriate placement, as well as an order requiring SBISD to pay the cost for her to attend

Briarwood.

On February 24, 2015, the parties participated in a resolution process, but were unable

to resolve their dispute.  The Due Process hearing was initially set for May 13-15, 2015, but

was rescheduled for September 1-3, 2015.  (Tr. at 76-80).  On July 24, 2015, Plaintiffs filed a

second request for a due process hearing.  (Tr. at 135-137).  In that request, Plaintiffs

complained that SBISD did not offer E.R. a FAPE, beginning on April 25, 2015, because:

(1)  SBISD did not develop an IEP or educational placement because it did not hold an
annual ARD meeting in April, 2015, after E.R. was withdrawn from Frostwood; and

(2)  SBISD violated the procedural requirement to convene the annual ARD committee
meeting on or before April 24, 2015.

(Tr. at 135-138).  Plaintiffs requested a finding that E.R. was denied a FAPE from April 25,

2015 until April 24, 2016, and that Briarwood is an appropriate school.  (Tr. at 237).  Plaintiffs

asked that SBISD pay the cost of enrollment at Briarwood School for the 2015-2016 school year, as well as attorney's fees.  (Tr. at 137).

The two claims were consolidated and a hearing took place over three days beginning September 1, 2015.  (Tr. at 241, 76-80).  The evidence was presented through the testimony of fifteen witnesses and almost 1,700 exhibits.  (See, generally, Tr. 2137-2943).  Much of the testimony focused on Ms. Pye, S.R.'s interactions with SBISD, and the classroom setting at Frostwood, with significant disagreement between the parties on every issue.

S.R. argued that SBISD should have convened an ARDC meeting before transferring E.R. to Frostwood to ensure that her serious health conditions were fully known and adequately addressed in the new environment.  He also believed that the Frostwood program was not ready for the start of the 2014-2015 school year, because the classroom was not appropriately designed, and the staff was not qualified to teach his daughter.  S.R. explained that, even though he only visited the classroom three times, Ms. Firozgary provided daily reports to him concerning the classroom, so he had direct knowledge that it was poorly run.  (Tr. at 2345). The result, according to S.R., was a classroom that did not encourage learning, but instead caused stagnation and regression.  These perceived failures, argued S.R., were procedural and substantive violations of the IDEA that denied E.R. a FAPE.

Plaintiffs also presented testimony from Adina Rich to support the contention that the IEPs developed by SBISD for 2014-2015, and 2015-2016, were inadequate and violated the IDEA.   Ms. Rich is an educational consultant who conducts independent evaluations for parents.  (Tr. at 2551).  Ms. Rich described what she believed were deficiencies in the IEPs. She explained that, in her opinion, the IEPs should have been "a little bit more specific" in the objectives, and more precise in the goals, so that progress could be measured more accurately.

(Tr. at 2552, 2580).  Ms. Rich pointed to the handwriting goal as an example of this failure, because it did not define an "appropriate size" for the letters.  (Tr. at 2580).  In addition, there was not sufficient "baseline data" to determine if that goal was appropriate.  (Tr. at 2580).  She wanted to know, for example, if E.R. was using adaptive paper or a spacer, as well as the type of prompts that were given, to know if the goal was appropriate.  (Tr. at 2580-2581).  In the same way, the goal for reading was not measurable, because the IEP did not describe E.R.'s beginning reading level.  (Tr. at 2581).  She also believed that the IEPs were not "tied as clearly as they could have been to the TEKS and any evaluation or data collection."  (Tr. at 2552).  She pointed out that the description of E.R.'s level of performance did not include each of the main subjects of the TEKS.  (Tr. at 2564-2569).  This is critical, according to Ms. Rich, because without knowing her current level of knowledge in each subject, the school cannot prepare goals for all academic areas, and the result is a gap in the student's knowledge.  (Tr. at 2565).  Because SBISD did not assess E.R.'s present level of knowledge in each TEKS area, she could not tell if the IEPs reflected appropriate goals that would allow E.R. to progress.  (*Id.*).

Ms. Rich was also critical of the April 2014 IEP, because it did not differentiate between third grade and fourth grade goals.  (Tr. at 2561-2562).  The April 2014 IEP covered the final six weeks of E.R.'s third grade year, and almost all of her fourth grade year.  (Tr. at 2561).  In spite of that, the IEP was not "clearly tied" to the fourth grade TEKS for the period of time she was in the fourth grade.  (Tr. at 2562).

Ms. Rich did acknowledge that IEPs are based on the student's needs and should set realistic expectations for progress.  (Tr. at 2571).  She agreed that E.R. is unable to learn in a mainstream class without accommodations; that E.R. is deficient in all academic areas; and that she cannot learn content that is presented at grade level instruction.  (Tr. at 2571-2572).  She

admitted that there is no need for an IEP goal for each TEKS, each strand, or each essence statement of the TEKS.[31]  (Tr. at 2603).  She insisted, however, that IEPs must be written with goals that are based on grade level TEKS, even though the IEPs need only include the most critical expectation within a specific area.  Because the IEP did not clearly describe fourth grade level goals, Ms. Rich insisted that it was deficient.  (Tr. at 2600-2603).

The hearing officer allowed the parties to submit written closing statements.  (Tr. at 263).  In their closing statement, Plaintiffs argued that SBISD did not include the parents in the decision to move E.R. to Frostwood, and that the failure to do so violated the procedural requirements of the IDEA.  (Tr. at 269).  Plaintiffs contended that SBISD acted in bad faith by excluding the parents, and ignoring their input, when moving her.  (Tr. at 270).  They further claimed that SBISD's failure to respond to the issues raised in the December 10, 2014 ARDC meeting violated the IDEA, and that SBISD erred again, when it did not convene an ARDC meeting prior to April 24, 2015.  (Tr. at 273).  Plaintiffs insist that the April 24, 2014 IEP was deficient, because it did not describe how E.R.'s disability affected her ability to participate in the general education curriculum; it was not tied to the TEKS or any evaluation data; and it did not contain baseline data from which progress could be measured.  (Tr. at 274-280).  They argued that E.R. did not make meaningful progress at Frostwood, and that the lack of progress proves that the IEP was deficient.  (Tr. at 280-281).

SBISD contended that the IEP and the goals it set were appropriate under the IDEA.  (Tr. at 292-296).  SBISD denied that it was obligated to convene an ARDC meeting to consult the parents before moving E.R. to Frostwood.  (Tr. at 296-297).  The District argued that its failure to respond as quickly as S.R. wished after the December 10, 2014 ARD did not force

---

[31]  A strand is a component, or category, in each area of TEKS.  An essence statement is a guide in the TEKS that explains what the TEKS is intended to cover and accomplish.  (Tr. at 2576, 2562).

E.R.'s withdrawal, because her move to Briarwood was already underway. (Tr. at 298-299). SBISD denied that E.R.'s health was ever at risk at Frostwood, or that the staff was improperly trained. Finally, SBISD argued that it was not obligated to convene an ARDC meeting in April 2015, because E.R. had withdrawn from school, and there was no indication that she would return. (Tr. at 301-303).

The hearing officer issued her decision on October 16, 2015. (Tr. at 25). She discussed the testimony and the exhibits presented at the hearing. She pointed out that Plaintiffs concentrated on whether the goals were appropriate, but did not argue that the school failed to implement those goals. (Tr. at 11). She determined that the goals were appropriate and reasonably calculated to produce progress, even though the District made a procedural error in failing to describe how E.R.'s disability affected her learning. (Tr.at 13). She also concluded that the District was not required to hold an ARDC meeting before transferring E.R. to Frostwood. (Tr. at 14). She did not believe the lack of a response following the December 10, 2015 ARDC meeting impeded the parents' ability to participate in the decision making process in light of the fact that they had already made arrangements to move E.R. to Briarwood. (Tr. at 15). She found that E.R.'s safety was not jeopardized by the location of the classroom, or by any delay in training all of the relevant staff on E.R.'s medical needs. (Tr. at 16). By a preponderance of the evidence, the hearing officer found that SBISD made a FAPE available to E.R. for the 2014-2015 and 2015-2016 school years. (Tr. at 16-19). Finally, she held that Briarwood is not an appropriate private placement, because it is not individualized to meet E.R.'s needs. (Tr. at 21). For that reason, she ruled in favor of SBISD on all issues. (Tr. at 21-24).

### III.  APPEAL TO THE DISTRICT COURT

On January 7, 2016, E.R., through her parents, filed the present action.  (Plaintiffs' Original Complaint, Docket Entry #1).  Plaintiffs challenge the hearing officer's decision and argue that SBISD violated the IDEA, both procedurally and substantively, in denying E.R. a free appropriate public education.  (Plaintiff's Motion at 17).  Plaintiffs argue that the IEPs were deficient, and not reasonably calculated to provide a meaningful educational benefit.  (*Id.* at 11).  Plaintiffs insist that E.R.'s removal from mainstream science, and the elimination of her behavioral plan and occupational therapy goal during the April 24, 2014 ARD Committee meeting, were done without notice, as was the transfer to Frostwood, and that these actions impeded their ability to participate in the process.  (*Id.* at 5-9).  They repeat their belief that the lack of an ARDC meeting in April 2015, violated the IDEA because an IEP was not prepared for the following year.  (*Id.* at 18-19).  In addition to the arguments made in the due process hearing, Plaintiffs further claim that SBISD's decision to limit the IEP to a handful of critical goals discriminates against children with disabilities in violation of both § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("§ 504") and the Americans with Disabilities Act. (*Id.* at 20).  Because E.R. is not exposed to all of the education standards required by the state for general education students, she has been deprived of those standards.  (*Id.* at 20).  The complaint requests the same relief presented to the hearing officer, that is, reimbursement for the private tuition costs, compensatory damages, and attorney's fees, and an additional request for an order enjoining SBISD from further acts of discrimination.  (*Id.* at 23).

### IV.  STANDARD OF REVIEW

The IDEA directs courts, when reviewing a state hearing officer's decision, to receive the records of the administrative proceedings, to hear additional evidence at the request of a

party, and to grant appropriate relief based on a preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C); *Houston Independent School Dist. v. Bobby R.*, 200 F.3d 341, 347 (5th Cir. 2000). In conducting a review, the court must accord "due weight" to the hearing officer's findings, but it must also must review the evidence and "reach an independent decision based on a preponderance of the evidence." *Bobby R.*, 200 F.3d at 347 (5th Cir. 2000)(quoting *Cypress-Fairbanks Indep. Sch. Dist. v. Michael F. ex rel. Barry F.*, 118 F.3d 245, 252 (5th Cir. 1997)); *see also Adam J. ex rel. Robert J.*, 328 F.3d at 80. For that reason, the district court's review is described as "virtually de novo." *Bobby R.*, 200 F.3d at 347; *Michael F. ex. rel. Barry F.*, 118 F.3d at 252. Summary judgment is "not directed to discerning whether there are disputed issues of fact, but rather, whether the administrative record, together with any additional evidence, establishes that there has been compliance with IDEA's processes and that the child's education needs have been appropriately addressed." *Seth B. v. Orleans Parish School Board*, 810 F.3d 961, 967 (5th Cir. 2016).

As a practical matter, the IDEA creates a presumption in favor of the education plan proposed by the school district, and places the burden of proof on the party challenging it. *Salley v. St. Tammany Parish Sch. Bd.,* 57 F.3d 458, 467 (5th Cir.1995). Here, because S.R. and K.R. challenge the school's recommended IEP, they bear the burden to show that it is inappropriate. *Id.*; *and see Michael F. ex. rel. Barry F*, 118 F.3d at 252. To determine whether Plaintiffs have carried that burden, it is important to remember that

> Congress left the choice of educational policies and methods where it properly belongs -- in the hands of state and local school officials. [The court's] task is not to second-guess state and local policy decisions; rather, it is the narrow one of determining whether state and local school officials have complied with the Act.

*Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989).

# V.  ANALYSIS

## A.      IDEA Legal Standards

Congress enacted the IDEA to ensure that children with disabilities will have access to public education, including special education and related services.  *See* 20 U.S.C. § 1400(d)(1)(A); *Daniel R.R.,* 874 F.2d at 1044.  The IDEA requires school districts in states receiving designated federal funds to implement procedures and policies that assure that each disabled student receives a free appropriate public education ("FAPE").  20 U.S.C. §§ 1412(a)(1), 1415(a).  To ensure that a child receives a FAPE, the IDEA places a premium on the local, collaborative efforts of professionals and parents in addressing the needs of a disabled child.  *See R.H.*, 607 F.3d at 1008 (noting that the IDEA contemplates parents and school districts collaborating on an IEP in order to ensure that the child receives a FAPE).

The promise of a FAPE guarantees a "basic floor" of opportunity "specifically designed to meet the child's unique needs, supported by services that will permit him to benefit from the instruction."  *R.H.*, 607 F.3d at 1008 (quoting *Richardson Indep. Sch. Dist. v. Michael Z.*, 580 F.3d 286, 292 (5th Cir. 2009)) *and Michael F.*, 118 F.3d at 347.  The IDEA does not require an IEP that maximizes the student's potential, nor does it require educational opportunities "substantially equal to the opportunities afforded children without disabilities."  *Endrew F. ex re. Joseph F. v. Douglas County School Dist. RE-1*, 137 S.Ct. 989, 197 L.Ed.2d 335 (2017); *compare R.H.*, 607 F.3d at 1008; *see also Adam J. ex rel. Robert J.*, 328 F.3d at 808 (stating that the placement is appropriate if it is designed to meet the particular child's needs and includes services that will permit the child to benefit from instruction, even if it is not the "best possible" placement).  Still, the educational benefit which the IDEA contemplates, and to which an IEP must be geared, cannot be "a mere modicum or de minimis" benefit.  Instead, the

IEP must be "likely to produce progress, not regression or trivial educational advancement." *Michael F. ex rel. Barry F.*, 118 F.3d at 248. "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Endrew*, 137 S.Ct. at 1001. In short, the educational benefit that an IEP is designed to achieve must be "meaningful" and "appropriately ambitious in light of the student's circumstances." *Id.*

The IDEA contains both procedural and substantive requirements. *See, e.g.*, 20 U.S.C. §§ 1412(a), 1414, 1415. Therefore, the court must focus on two questions: 1) "has the State complied with the procedures set forth in the [IDEA]?" and 2) is the IEP "reasonably calculated to enable the child to receive educational benefits?" *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206-07 (1982); *see also Adam J. ex rel. Robert J.*, 328 F.3d at 809. With respect to the first inquiry, "procedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of an educational opportunity[.]" *Klein Indep. Sch. Dist. v. Hovem*, 690 F.3d 390, 396 (5th Cir. 2012). Four factors guide the court's analysis in the second inquiry. It must evaluate whether: "(1) the program is individualized on the basis of the student's assessment and performance; (2) the program is administered in the least restrictive environment; (3) the services are provided in a coordinated and collaborative manner by the key 'stakeholders'; and (4) positive academic and non-academic benefits are demonstrated." *Michael F.,* 118 F.3d at 253. Courts are not required to consider or to weigh these factors in any particular way, but take a "holistic approach" when considering the sufficiency of an educational plan. *Michael Z.,* 580 F.3d at 293; *Hovem*, 690 F.3d at 397.

**B.      Discussion**

Plaintiffs here describe what they perceive to be a number of procedural and substantive violations of the IDEA. Their overarching complaint stems from E.R.'s transfer from

Wilchester Elementary to Frostwood Elementary school.  Plaintiffs contend that it was improper to transfer her from one school to the other without their input and without holding an ARDC meeting to discuss E.R.'s health.  They argue that she regressed while at Frostwood, because the school was inferior, and because the education plan for her was inadequate. Plaintiffs also complain that SBISD discriminated against E.R. by not offering her access to the entire curriculum that is offered to non-disabled students.  They further complain that some services to E.R. were discontinued without their knowledge.  Finally, they insist that SBISD was required to convene an ARDC meeting in April 2015, even though E.R. had withdrawn from public school by that time.  Plaintiffs argue that these actions, individually and together, violate the IDEA, and so denied E.R. a FAPE.

### 1.   Transfer to Frostwood

#### a.   *Requirement to Hold an ARDC*

As noted, the origin of this dispute is SBISD's decision to move E.R. to Frostwood for the 2014-2015 school year.  Plaintiffs argue that the IDEA makes it clear that parents are to be a part of the team that creates an IEP and determines the educational placement of a child, a decision that includes school location.  (Plaintiffs' Motion at 10-11).  *See,* 20 U.S.C. § 1414(d)(1)(B).  Plaintiffs insist that they should have been part of this decision making process, because E.R.'s transfer was a change in educational placement under the IDEA in light of her fragile health.  (Plaintiffs' Motion at 1).  They argue that the April 24, 2014 IEP paperwork showed that Wilchester was the location for services for the upcoming school year, and that any change to that location required an ARDC meeting to assess whether Frostwood could accommodate E.R.'s health and safety needs.  (Plaintiffs' Motion at 10).  SBISD denies that a transfer between schools requires an ARDC meeting.  (Defendant's Motion at 28-30).

The Fifth Circuit has avoided any bright line rule that a "change in location" can never constitute a "change in placement."  *See, Weil v. Bd. of Elementary & Secondary Educ.,* 931 F.2d 1069 (5th Cir.1991) (holding notice not required before transfer under the particular facts of that case after pointing to the lack of bad faith by the district).  But this Circuit has stated that "placement" does not mean a particular school.  Instead it means a setting, such as regular classes, special education classes, special schools, home instruction, or hospital or institution-based instruction.  *White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 379 (5th Cir. 2003). Because of this, a district is not obligated to consider parent's opinions on which school location is appropriate.  *Id.* at 379 ("that parents must be involved in determining 'educational placement' does not necessarily mean they must be involved in site selection").

In this case then, SBISD is correct in arguing that it was not required to convene an ARDC meeting before moving E.R. to Frostwood.  The move from Wilchester to Frostwood, by itself, is not a change in placement under the IDEA.  *White*, 343 F.3d at 379.  So long as Frostwood offered continuity in E.R.'s education, SBISD was neither obligated to hold an ARDC meeting to discuss the move, nor accede to S.R.'s demands to move her back to Wilchester.  *See, e.g., Weil*, 931 F.2d at 1072.

### b.    Did the Move Disrupt E.R.'s Education

Although SBISD might have the right to make a unilateral decision to move E.R. to Frostwood, and to keep her at that location despite the protestations of her parents, it must not do so if that causes a significant disruption in her educational opportunities.  *See, Weil*, 931 F.2d at 1072 (citing *Lunceford v. District of Columbia Bd. of Educ.*, 745 F.2d 1577, 1582 (D.C.Cir. 1984) (stating that one "must identify, at a minimum, a fundamental change in, or elimination of a basic element of the education program in order for the change [in schools] to

qualify as a change in educational placement")); *Comb v. Benji's Special Educ. Acad., Inc.*, 745 F. Supp. 2d 755, 768–69 (S.D. Tex. 2010) (acknowledging that a transfer could be a change in placement if plaintiff can show that continuity of education is interrupted). Here, S.R. insists that the Life Skills classroom at Frostwood failed to provide the same learning environment that E.R. enjoyed at Wilchester. However, the controlling question is not whether Frostwood was inferior to Wilchester, but whether the transfer to Frostwood resulted in a fundamental, and detrimental, change to E.R.'s education. *See, e.g., Weil*, 931 F.2d at 1072; *Sherri A.D. v. Kirby*, 975 F.2d 193, 206 (5th Cir. 1992). Because Plaintiffs insist that an ARDC meeting was necessary before moving their daughter to Frostwood, it is their burden to show that the move caused a fundamental change to a basic element of her educational program. *Comb*, 745 F. Supp. 2d at 768–69.

### 1) E.R.'s Health and Safety

Neither party disputes that SBISD has an obligation to provide school "health services that are designed to enable a child with a disability to receive FAPE." *See,* 34 C.F.R. 300.34(c)(13). Any "service that enables a handicapped child to remain at school during the day is an important means of providing the child with the meaningful access to education" under the IDEA, and that includes medical services necessary for the health of the student. *Irving Ind. Sch. Dist. v. Tatro*, 468 U.S. 883 (1984) (requiring school to provide or pay for clean intermittent catheterization for disabled student). The guiding principal, then, is whether SBISD provided health and related services to E.R. that allowed her to remain at school and receive a FAPE. Plaintiffs argue that it did not.

From the moment that they learned that E.R. might be transferred to Frostwood, Plaintiffs expressed concern about her safety in a new environment. (Tr. at 1908-1910; S.R.'s

May 5, 2014 letter to Jan Teater).  They have not complained, however, about the substance of

E.R.'s health plan.[32]  Instead they argue that the health plan was not properly implemented,

because the staff was not timely trained; the plan was not "vetted" by the Frostwood staff; and

that the nurse was located at a distance from the classroom.  (Plaintiffs' Motion at 14, Tr. at

2237).  Plaintiffs insist that this is proof that the IEP was deficient, and so justified E.R.'s

removal from Frostwood for safety reasons.  (Plaintiffs' Motion at 14).

      SBISD concedes that Frostwood did not train all of the staff who were working with

E.R. on the very first day of school.  At the December 2014 ARDC meeting, Principal Green

also agreed that it was preferable to locate the Life Skills class nearer to the nurse's office, and

that the location of this classroom was chosen without her input.  (Exhibit 6 at 1:06:00-

1:10:00).  However, SBISD argues, E.R.'s safety was never in jeopardy, and she was never

harmed.  (Defendant's Response at 1-2).

      The preponderance of the record evidence supports the conclusion that SBISD provided

the necessary related services to E.R. to allow her to attend school in satisfaction of its

obligations under the IDEA.  The Individual Health Plan for E.R. was prepared at Wilchester

and adopted by Frostwood, and there is no evidence that her health needs changed when she

moved to Frostwood.  (Tr. at 591).  SBISD transferred Ms. Firozgary to Frostwood in response

to S.R.'s complaint that the staff at the new school would not know his daughter's personality

well enough to recognize signs of a seizure or shunt failure.  (Tr. at 1911).  Before school

started, Nurse Musgrove and Ms. Pye both reviewed E.R.'s health plan, and both were familiar

with the seizure protocol.  (Tr. at 2643, 2863).  Both were aware of the necessary treatment if

---

[32] While Plaintiffs allege that the distance of the classroom from the nurse's station is unsafe and that the nurse had to pass through a courtyard and through a locked door, that is not an express criticism of the substance of the health plan.  (Tr. at 2238).

E.R. suffered a seizure.  (Tr. at 2643, 2863).  On the first day of school, Ms. Firozgary and Nurse Musgrove were prepared to implement all aspects of E.R.'s health plan if she had a seizure, including the administration of Diastat.  (Tr. at 2865).  Within three weeks, Ms. Pye, Mr. Pineda, and the resource teachers next to her classroom had been trained to administer Diastat in the event of a seizure.  (Tr. at 2873).

Although S.R. alleges that the staff is still untrained and unqualified to care for E.R., he does not identify any additional training that is required, or any additional health services that E.R. needs.[33]  Further, there is no indication that E.R.'s education was adversely affected because the health services at Frostwood may be inferior to those provided at Wilchester, or because the staff was not immediately trained to implement the health plan.  The evidence, instead, shows that Frostwood implemented the same health plan as that at Wilchester, and offered the same health and related services which allowed E.R. to attend class every day, for the entire day.  *See, generally, Tatro*, 468 U.S. at 883.

Plaintiffs' frustration over the location of the classroom, likewise does not support the contention that E.R. was unsafe at school, or the argument that it denied her a FAPE.  S.R. has not identified any actual risk that stems from the location of the classroom.  Even though he believes that the room was too far from the nurse's office to insure E.R.'s safety if a seizure occurred, the testimony shows that Nurse Musgrove can reach the classroom in less than 45

---

[33]  S.R.'s dissatisfaction appears to arise from the fact that he was not invited to train the staff to handle E.R.'s health emergencies.  ("The whole issue was—I know this:  We didn't get to provide the parental input. . . . I still have qualms [about the nurse's training of the staff] because no one can explain it like we can.")  (Tr. at 2342-2343).  However, Nurse Musgrove testified that he never asked to be involved in the training, and never asked her to train additional staff.  (Tr. at 2869-2870).  At the due process hearing, S.R. did point out that at Wilchester, Nurse Herbst retrained E.R.'s teachers every month in accordance with the SBISD Health Services Guidelines and Procedures stating that "the nurse will continue to provide monthly monitoring for all unlicensed staff."  (Tr. at 572)  That was not done at Frostwood.  (Tr. at 2868).  Nurse Musgrove testified this is not a requirement, but only a guideline that has since been changed to every nine weeks.  (Tr. at 2874).  Whether a requirement or a guideline, there is no evidence that Nurse Musgrove's failure to "monitor" or retrain the staff monthly affected the provision of related services by SBISD to E.R.

seconds, well within the two minute window.[34]  Within three weeks, there were at least six staff members in the Life Skills classroom, or next door in the resource room, who could administer Diastat if E.R. had a seizure.  E.R. carries a dose of the medicine with her at all times.  (Tr. at 2866).  Any perceived risk that Nurse Musgrove might not be able reach the classroom and administer Diastat within two minutes, because of the location, was mitigated by the fact that E.R. was always accompanied by a qualified adult.  The classroom was in a convenient location if an ambulance was required, and S.R. agreed that was an important consideration.  (Tr. at 2778, Ex. 6 at 1:02:00-1:05:00).  Myrtle Herbst, the nurse at Wilchester who developed E.R.'s health plan, agreed that the distance between the nurse's station at Frostwood and the classroom did not pose a risk to E.R.  (Tr. at 2884).

The preponderance of the evidence supports the hearing officer's conclusion that SBISD provided the necessary "related services" to E.R. to allow her to safely attend school and receive a FAPE at Frostwood.  (Tr. at 21-24).  For that reason, Frostwood's implementation of E.R.'s health plan did not impede her education and deny her a FAPE.

### 2) School Preparation

Plaintiffs also argue that the staff at Frostwood was not prepared for the school year.  (See generally, Plaintiffs' Motion at 11-15).  They contend that, taken together, these complaints show that Frostwood did not offer an appropriate education.  (Plaintiffs' Motion at 5)("Each of the procedural inadequacies, individually and cumulative, were significant, deprived the parents of having meaningful input into the development of E.R.'s IEP and placement, and caused educational harm to E.R. during 2014-2015 school year.").  For

---

[34] E.R.'s classroom at Briarwood is even further from the nurse's station, but S.R. is comfortable with her safety there.  See, testimony of Beverly Brinkmeyer, E.R.'s teacher at Briarwood ("[The nurse] is located about two minutes from my classroom." (Tr. at 2304); testimony of S.R (Tr. at 2332)).

instance, Plaintiffs point to an omission in the April 24, 2014 IEP.  (Plaintiffs' Motion at 14).

Both parties agree that E.R. required one to one assistance at all times, but that was not required

by the IEP prepared by the Wilchester staff in April 2014.  (Plaintiffs' Motion at 14)("For

example, at the beginning of the school year, E.R.'s IEP failed to include an assigned aide. . .").

As SBISD points out, however, Ms. Pye recognized that deficiency at the start of the school

year, and the IEP was formally corrected, through the ARDC process, within three weeks.  E.R.

was accompanied by an aide at all times, from the first day of school, and there is no evidence

that her education suffered because of this error.  Although the IEP may have been technically

deficient, the implementation of it at Frostwood did not result in a fundamental change in

E.R.'s education, because she received the same level of aide support at both schools.

S.R. was also frustrated by the confusion about Ms. Firozgary's role at Frostwood.  S.R.

believed that Ms. Firozgary was moving to Frostwood solely to accompany E.R.  Neither

Principal Green nor Ms. Mathis had that understanding.[35]  (Tr. at 1106, 2716).  S.R. insists that

this is evidence of the confusion and lack of preparation at Frostwood, and further evidence that

there was no collaboration between the parties.  (Plaintiffs' Motion at 14).  Even if there was a

misunderstanding on Ms. Firozgary's role at Frostwood, that misunderstanding was resolved in

early October.  There is no evidence that Frostwood's failure to assign Ms. Firozgary to E.R.

alone, from the first day of school, affected her education in any way.  In fact, the evidence

supports the conclusion that limiting E.R. to Ms. Firozgary's supervision alone limited her

educational opportunities.  E.R. was forced to either skip school or miss activities on days when

---

[35] Ms. Mathis testified that Ms. Firozgary was a "general aide" and was not specifically assigned to E.R.  (Tr. at 2716).

Ms. Firozgary was absent or unable to leave the Life Skills room.[36]  Ms. Pye believed that Ms. Firozgary was too familiar and lenient with E.R., and she sometimes required Mr. Pineda to intervene to get E.R. to do her work.[37]  (Tr. at 2648).  Although S.R. insisted that Ms. Firozgary care for only E.R., there is no evidence that was a necessary precaution.  Nor is there any indication that E.R.'s education at Frostwood suffered because Ms. Firozgary was not assigned to E.R. for the first six weeks of school.  That Ms. Firozgary was not assigned to E.R. by SBISD did not fundamentally change E.R.'s education at Frostwood.

### 3)  Staff Qualification

S.R. also believes that the staff at Frostwood was not qualified to run a Life Skills class for a student with E.R.'s medical needs.  (Tr. 2348-2349, 557).  He insists that Mr. Pineda's failure to "engage" with him or E.R. at the open house proved that he was not qualified to work with special education children.  (Tr. at 2383).  Further, Mr. Pineda did not assist the children in using the toilet, which S.R. believes is an integral part of the Life Skills classroom, and shows his incompetence.  (Tr. at 2384).  He believes that Mr. Pineda has only worked with regular education students in the past, and so he perceives that Mr. Pineda does not have the proper personality to work with special education students.  (Tr. at 2385-2386).

In response, SBISD provided evidence that Mr. Pineda has a bachelor's degree in psychology, and that he worked for three years providing early childhood intervention to developmentally disabled children.  (Tr. at 1951-1952).  Before being hired for the Life Skills class, he was a substitute teacher at Frostwood and was the first choice for many of the

---

[36]  On at least one occasion, E.R. was forced to miss her regular art class because Ms. Firozgary could not accompany her out of the class.   Ms. Pye arranged for a similar art project to be done in class.  (Tr. at 1872).

[37]  Ms. Pye thought Ms. Firozgary was "a detriment to E.R.'s learning on many days because she was so familiar with her. . .  She treated her like a family member and not like a student.  Her discipline wasn't as professional as what I would expect in a classroom, and often she wouldn't work for [Ms. Firozgary]."  (Tr. at 2648).

teachers.  (Tr. at 2772).  When he was hired, it was agreed that he would not assist the female students with toileting, except in an emergency.  (Tr. at 2671, 2773).  At the beginning of the year, there were no male students in the Life Skills classroom who required assistance, so Mr. Pineda had no toileting responsibilities.  (Tr. at 2671-2672).  Mr. Pineda has a calm, quiet demeanor that fits well in the classroom setting, according to Ms. Pye, and many of the students love him.  (Tr. at 2671).

S.R. also complained that Ms. Pye "fail[ed] horribly" as a teacher, because she did not communicate with the families and did not provide progress reports.  (Tr. at 2375, 2364).  Ms. Firozgary told him that Ms. Pye was "regularly disengaged from the students," worked on her computer all the time, and acted as though teaching was a burden.  (Tr. at 2381).  Ms. Firozgary also reported that Ms. Pye refused to use any of the alternative teaching methods suggested by the support staff, and would not let Ms. Firozgary implement those suggestions.[38]  (Tr. at 2475).

S.R. did not approve of the way Ms. Pye arranged and decorated the classroom.  He described the room as sterile, and lacking in the visual stimulation typical of a Life Skills classroom.  It was completely different from the classroom at Wilchester.  (Tr. at 2244).  Ms. Firozgary also told him that the window blinds were always closed because Mr. Pineda had problems with migraines or light sensitivity.[39]  (Tr. at 2243).  According to Ms. Firozgary, any time she left the room, the lights would be turned off and the blinds closed.  (Tr. at 2462).  On those occasions on which he saw the classroom, S.R. did not think it was an inviting environment for the Life Skills students.  (Tr. at 2244).

---

[38]  Ms. Firozgary did not identify any of these methods, or indicate how they were appropriate for E.R.

[39]  Ms. Pye testified that Mr. Pineda never complained to her of migraines.  (Tr. at 2698)

SBISD produced evidence that Ms. Pye is a certified special education teacher.  (Tr. at 1939).  She taught Life Skills students for three years at another school, and had transferred to Frostwood to teach third grade when that position was eliminated.  (Tr. at 2639).  She received the highest teacher rating, and she was the acting principal for the school over the summer.  (Tr. at 2771-2772).  Principal Green visited the Life Skills classroom almost daily and saw Ms. Pye working with the students.  She had no concerns about Ms. Pye's teaching ability.  (Tr. 2774).

Ms. Pye explained that she selected neutral colors for the room that were consistent with the Montessori philosophy of a natural, calm environment.  (Tr. at 474).  She did not have bright posters covering the walls, because that can be overstimulating for some children.  (Tr. at 2668).  She often closed the blinds to assure that the students had privacy in the classroom, because it was near the front entrance, and because the large windows caused the room to get hot in the afternoon.  (Tr. at 2669, 2910).

The evidence establishes that Ms. Pye and Mr. Pineda are qualified to teach in the Life Skills classroom.  As discussed, they were also trained to care for E.R. in a health emergency.  Although S.R. did not approve of the way the classroom was set up, there is no evidence that it was an inappropriate environment for the students.  Plaintiffs have not shown that E.R.'s transfer to Frostwood affected E.R.'s education by placing her with unqualified staff or in a poorly designed setting.

### 4)  Continuity and Communication

Plaintiffs next argue that E.R.'s education at Frostwood was disrupted by Ms. Pye's absences and the lack of communication with them.  S.R. was also frustrated by the lack of progress reports from Ms. Pye or samples of E.R.'s work, which contributed to his sense that she was not learning in the Frostwood classroom.  (Tr. at  2375).  According to S.R., he

received no updates on E.R.'s progress until he demanded the ARDC meeting in December. (Tr. at 2375).  He testified that the lack of information on a daily basis, and the failure to regularly provide updates on E.R.'s progress, was evidence that Ms. Pye was failing as a teacher, and proof that his daughter was regressing.  (Tr. at 2376).  He also claimed that E.R.'s language skills regressed while she was at Frostwood and rebounded when she moved to Briarwood, proving that the class was poorly run.[40]  (Tr. at 2278-2280).

SBISD contends that any disruption caused by Ms. Pye's illness was minimal.  Ms. Pye prepared binders with work for each student so that a substitute teacher could continue with the lesson plan in her absence.  (Tr. at 2644-2645).  Although substitute teachers were used in the Life Skills class initially, the procedure was changed so that resource teachers filled in for Ms. Pye and the substitute teacher went to the resource room.  (*Id.*).  Plaintiffs have offered no evidence to show that E.R.'s conduct or effort in the classroom was any different when Ms. Pye was absent than when she was present, or that the teaching by a substitute was any less effective.

SBISD also insists that S.R. had an open line of communication with Ms. Pye, and Principal Green, that began shortly after school started in the fall.  (Tr. at 2334-2335).  After S.R. first complained to Principal Green about a lack of communication, Ms. Pye created a "blog" for her classroom to which she posted almost daily updates for E.R. from September 12, 2014, to October 31, 2014.[41]  (Tr. at 473-495, 2368, 2648).  These posts, in general, described

---

[40]  There is no independent evidence to support this contention.

[41]  Ms. Pye created a webpage for her class with links to a password protected area for each student in which she provided individual updates that only the family members could see.  (Tr. at 1864, 2648).

E.R.'s day.[42] (*Id.*). Although S.R. had demanded greater communication, he was not satisfied with Ms. Pye's blog because it was "unilateral communication."[43] (Tr. at 2268). In his October 27, 2014 meeting with Principal Green and Jan Teater, S.R. complained about the blog and requested a "communication notebook" that would be sent home each day. (Tr. at 2268). Ms. Pye then ended the blog and, in its place, she sent home a sheet of paper each day listing the subjects that E.R. worked on that day.[44] (Tr. at 2651). S.R. did not like this approach either because it was still unilateral communication. (Tr. at 2269). Ms. Pye testified that she gave each of the parents her email address and cell phone number, and she and K.R. texted frequently. (Tr. at 2651). But S.R. did not consider this to be an open line of communication with Ms. Pye, because it was not a communication notebook. (Tr. at 2336-2337).

---

[42] The entry for October 7, 2014, is representative of the substance of the blog:

"We had some more challenges today, but Ms. Mahnaaz noticed something... It seemed like today E. became resistant to work at around 12:45. She dug in her heels and did all the things we talked about yesterday. Then around 2:00 p.m. we noticed how focused she was on her work. That was 30 minutes after she took her medication.

"So I was wondering . . does E take ADHD medicine here at school? If so, maybe we are seeing the meds wear off a bit before she gets a new dose. Whatever the reason, we are going to start taking notes about time and activities to see if there are any patterns so that we can get a better look at how to motivate E through the tough stuff.

"For the most part, though, E had a FABULOUS day. She came in this morning with a big smile and she worked so hard on her handwriting and science. We started using a pencil grip today that was challenging for her to hold, but she paid close attention and tried to use it the right way. (I'm hoping to work on strengthening her grip to make handwriting a little easier for her.)

"E. had 4 bathroom breaks today. She nibbled a bit at lunch but she didn't eat much. And she gave me a cute little witch sticker that she earned in speech. (so sweet!).

"Just to recap: E might have had a grumpy moment today, but she brought joy to the room the rest of the day!" Tr. at 481 (ellipses and punctuation in original, E.R.'s name redacted).

[43] Although S.R. sent Ms. Pye an email on September 16, 2014, thanking her for the "spectacular updates," he explained that the email did not indicate he was actually happy with the blog or the "communication." It was, in fact, "postur[ing]" to "motivate" a teacher "who was failing," just three weeks into the school year. (Tr. at 1849, 2368-2369).

[44] Ms. Pye testified that she was told to end the blog, because it was not responsive to the parents' wishes, but she was not given a specific reason for any dissatisfaction. (Tr. at 2651).

SBISD also described Ms. Pye's attempts to provide progress reports to E.R.'s parents. On October 6, 2014, Ms. Pye emailed S.R. and K.R. to schedule a meeting for the end of October to go over "report cards, work samples, [and] IEP progress."  (Tr. 1868).  On October 24, 2014, after E.R. returned to school following the shunt failure, Ms. Pye again expressed a desire to meet with E.R.'s parents, and she then sent E.R.'s report card and IEP progress report home on October 27, 2014.[45]  (Tr. at 1885-1886).  E.R.'s parents asked her if they could wait a few weeks until after a party for their son, because planning that event was so time-consuming. (Tr. at 1884).  S.R., however, had no intention of meeting with Ms. Pye, but instead hoped E.R. would be transferred to another school after the October 27, 2014 meeting with Jan Teater and Principal Green.  (Tr. 2375).  When E.R. was not transferred, S.R. requested the ARDC meeting to "pursue all of the formal safeguards."  (Tr. at 2374).  S.R. was then given some work samples before the December ARDC meeting and he interpreted this to be evidence that the "school district realized, 'oh yeah, these parents are actually going to do something about this.'"  (Tr. at 2375).  S.R. explained that he was upset, because he believed Ms. Pye should have been sending work samples home on a daily basis, and should not require him to meet with her to see them.  (Tr. at 2375).  There is no evidence S.R. ever communicated this to Ms. Pye.

SBISD provided evidence that Ms. Pye sought to maintain continuity in the lesson plans when she was absent.  She also communicated frequently with S.R. and K.R., through email, blog postings, notes sent home, and by text.  Although S.R. did not like her reporting method, the evidence does show that she provided updates, almost daily, on E.R., as well as a formal progress report, after nine weeks.  On this record, Plaintiffs have not shown that Ms. Pye's

---

[45] This report did not include any information about E.R.'s progress in speech therapy or occupational therapy, and S.R. complained about that at the December ARDC hearing.  Ms. Pye testified that because of a change in the format, she inadvertently failed to print out the speech therapy notes.

illness disrupted E.R.'s educational opportunities, or that the communication and reporting to them were so deficient as to deny E.R. a FAPE or impede their right to collaborate on her education.

### 5) *Educational Progress*

Plaintiffs also insist the Frostwood classroom was so poorly run that there was no meaningful educational benefit at Frostwood.  (Plaintiffs' Motion at 14).  To show the absence of any educational benefit, Plaintiffs argue that E.R. remained at a first grade level in reading, and at a kindergarten to first grade level in math, from the time of the initial evaluation in 2011, through her transfer to Briarwood in January 2015.  (Plaintiff's Motion at 15).  Upon moving to Briarwood, Plaintiffs argue, E.R.'s reading increased from kindergarten to first grade level, and her math abilities progressed from the low kindergarten level to kindergarten level.  (Plaintiff's Response to Defendant's Motion for Summary Judgment, Docket #27, at 8).  According to Plaintiffs, this sequence of events shows that there was no educational benefit to E.R., and that she made no progress at Frostwood.[46]  (Plaintiffs' Motion at 15).

If the transfer to Frostwood caused E.R. to receive an education that had little or no academic benefit to her, that would clearly be a fundamental change that violated the IDEA. *Weil*, 931 F.2d at 1072.  But evidence that E.R. was not advancing grade levels is not, by itself, proof that there was no academic benefit to the educational program.  *See, e.g., C.H. ex. rel. C.H. v. Northwest Ind. School Dist.*, 815 F.Supp.2d 977, 991-992 (E.D. Tex. 2011) (finding academic progress as measured by teachers and testing, even though child remained at the same reading level for the entire school year); *Bobby R.,* 200 F.3d at 349 (noting that "a disabled child's development should be measured not by his relation to the rest of the class, but rather

---

[46]  Although Plaintiffs point to E.R.'s academic progress between 2011 and 2015, E.R. was only at Frostwood for the fall term in 2014.

with respect to the individual student, as declining percentile scores do not necessarily represent a lack of educational benefit, but only a child's inability to maintain the same level of academic progress achieved by his non-disabled peers").

SBISD contends that Ms. Pye recorded E.R.'s academic progress throughout her time at Frostwood. E.R. made progress in reading and writing, advancing to a first grade level in reading while at Frostwood. (Tr. at 2660-2661). E.R. was moving toward her IEP goals in math, science and social studies and appeared to be on target to meet all of these benchmarks. (Tr. at 2661-2662). Ms. Pye maintained records of this progress and prepared a summary of her work in preparation for the December 10, 2014 ARDC meeting. (Tr. at 2660, 1955-2017). Ms. Pye's testimony shows that there was an academic benefit to E.R., because she was, in fact, learning at Frostwood, even if it was far below the level of her non-disabled peers.

Ms. Pye is not the only person who saw evidence of academic benefit and progress for E.R. When Plaintiffs questioned the teaching in the class in October, SBISD contracted with Jean Hall to review the data compiled by Ms. Pye on each student in the classroom. (Tr. at 2725-2726). Ms. Hall concluded that E.R. was making appropriate progress toward the IEP goals and reported that observation to Jan Teater. (*Id.*). Vicki Cole was asked to observe the classroom to assess if the instruction was appropriate. She believed that it was and reported that to Jan Teater. Jan Teater concluded that the students were learning, and that the classroom instruction was appropriate, even though S.R. did not agree.

S.R. questions this testimony because "Ms. Pye's credibility is suspect," and Ms. Hall's statements are "nothing more than self-serving and inaccurate." (Plaintiffs' Response at 19). He also believed Ms. Pye was failing in her teaching because of the reports he received from Ms. Firozgary. (Plaintiffs' Response at 18) (Ms. Firozgary "was highly critical of the teacher at

Frostwood.").   Plaintiffs insist that their expert, Ms. Rich, established that there was no educational benefit, because she testified that there was no way to measure E.R.'s progress because there was no baseline data included in the PLAAFP.   (Plaintiffs' Response at 18). However, Ms. Rich admitted that she does not know what progress E.R. made at Frostwood beyond what is reflected in the records.   (Tr. at 2598).   She also conceded that she has no way of knowing whether E.R. received a meaningful educational benefit at Frostwood, because she only reviewed the IEPs and has not actually met with or evaluated the child.   (Tr. at 2598-2599).

While Ms. Rich is critical of the educational plan, because it is "too vague" and lacked a description of E.R.'s baseline, Ms. Pye, who implemented the plan, believed it set appropriate goals in light of E.R.'s abilities.   After assessing E.R.'s abilities at the beginning of the year, Ms. Pye determined that she was able to learn some of the skills described in the goals, so they were not too ambitious, but had not mastered the goals, so they were not too easy.   (Tr. at 2659).   She thought the goals were "spot on" for E.R.   (Tr. at 2659).   Considering all of the evidence, Ms. Rich's testimony does not show there was no meaningful educational benefit at Frostwood, only that she could not determine if the goals were appropriate for E.R.   The testimony of the SBISD staff who actually worked with E.R. shows that there was an educational benefit to E.R. from the instruction provided at Frostwood, and that the goals were appropriate.

S.R. admits that his opinion on the state of the classroom, and the alleged teaching deficiencies, comes largely from his communications with Ms. Firozgary.   It is clear from the

testimony that Ms. Firozgary had a strained relationship with Ms. Pye and Mr. Pineda.[47]  Ms. Firozgary "felt like an outsider at Frostwood," because of the way she was treated by Ms. Pye, Mr. Pineda and Principal Green.  (Tr. at 2466).  She claims that Ms. Pye threatened to have her fired because she was calling the parents to talk about the classroom, but she insists she only spoke with S.R. on a few occasions when he asked if Ms. Pye was at school that day.  (Tr. at 2468, 2470-2471, 2474).   She complained that she was responsible for all the toileting responsibilities because Mr. Pineda was excused from that task and Ms. Pye was a germaphobe.[48]  (Tr. at 2460-2461).  She told S.R. that, on one occasion, a student defecated on himself and he was forced to sit in the filth until Ms. Firozgary returned to the room.[49]  Ms. Pye would not let the students sit on a big pillow that Ms. Firozgary brought in, but instead "threw" it on top of a cabinet because the students did not want to work.  (Tr. at 2469).  Ms. Pye did not teach, was always on the computer, and did not allow Ms. Firozgary to implement the recommendations from the facilitators.  (Tr. at 2475)  Ms. Pye told her that she was not doing a good job, but would not help her improve.  (Tr. at 2464).  In her opinion, E.R. had shown no progress, but had stagnated while at Frostwood.

If believed, Ms. Firozgary's testimony might support S.R.'s claim that Frostwood was an inferior setting to Wilchester, and offered little or no educational benefit to E.R.  In this case, however, Ms. Pye's testimony was found to be more credible by the hearing officer.  Ms. Pye documented E.R.'s progress in emails, blog posts, data collection, and a chart that she

---

[47]  Ms. Firozgary and Mr. Pineda both complained to Principal Green about the other.  (Tr. at 2775).  Principal Green encouraged them to "work it out."  (Tr. at 2775).

[48]  Ms. Firozgary explained that Ms. Pye "didn't like odors . . . and would expect the kids to pull up and clean up."  (Tr. at 2461).  Ms. Pye testified that she expected the students to learn the skills necessary for independence, including cleaning themselves after going to the bathroom.  (Tr. at 2656).

[49]  Ms. Pye denied this event happened.  She testified that the only "bathroom accident" was a boy who "dribbled" on himself after urinating.  (Tr. at 2655).

prepared for the December 10, 2014 ARDC meeting.  Any suggestion that this data was created specifically for the ARDC meeting is foreclosed by the fact that at least two other people reviewed Ms. Pye's classroom data in late October, at Jan Teater's request, and interpreted it to show progress for all of the students.  The hearing officer found Ms. Pye's testimony to be more credible.  The preponderance of the evidence supports that decision.  *See, D.B. ex rel C.B. v. Houston Ind. School Dist.*, (S.D. Tex. 2007) 2007 WL 2547443 (rejecting plaintiff's argument that the hearing officer ignored evidence he found to be not credible because "the hearing officer, who hears live testimony and can observe witness demeanor, is in the best position to determine issues of credibility.").

Plaintiffs do not point to evidence that any element of E.R.'s educational program was fundamentally changed because of the move to Frostwood, despite the implication that it was an inferior education.[50]  *See, e.g., Weil,* 931 F.2d at 1071.  E.R. still attended a school administered by SBISD, received the same classes at Frostwood that she would have received at Wilchester, and the same IEP was implemented.  *Id.*  Plaintiffs have not shown that Ms. Pye's abilities, teaching methods, or classroom decorations were so inferior to Wilchester's that moving E.R. caused a significant disruption to, and decline in, the educational opportunities offered to her.[51]  Similarly, Plaintiffs have not shown that the qualifications of the teachers and

---

[50]  There is very little evidence comparing Frostwood with Wilchester, other than S.R.'s testimony on his perception of the two classrooms.  S.R.'s own testimony shows that E.R. is at roughly the same level at Briarwood as she was at Frostwood (i.e., first grade reading level and kindergarten/first grade math).

[51]  There is ample evidence that there were numerous differences between Wilchester and Frostwood; school entry procedures, location of room, and methods of communication with the teacher.  That does not show, however, that Frostwood was an inferior setting.

staff at Frostwood were inadequate or caused a loss of educational opportunity.[52]   The preponderance of the evidence shows that E.R. was making progress, and was likely to master each of her IEP goals by the end of the school year, and that those goals were appropriate for her abilities.   The hearing officer concluded that the credible evidence shows that SBISD provided adequate in class support, that E.R. made progress in the class, and that SBISD provided E.R. a FAPE for the 2014-2015 school year.  (Tr. at 12, 15).  The preponderance of the evidence supports these conclusions, and corroborates that the decision to transfer her from Wilchester to Frostwood did not result in the loss of an educational opportunity to E.R.

### 2.   April 24, 2014 Education Plan

Plaintiffs next complain that procedural and substantive violations occurred in developing the IEP for the 2014-2015 school year at the April 2014 ARDC meeting, so that the IEP was inadequate and violated the IDEA.  (Plaintiffs' Motion at 11-15).  In determining the adequacy of an education plan, the court focuses on two questions: 1) "has the State complied with the procedures set forth in the [IDEA]?" and 2) is the IEP "reasonably calculated to enable the child to receive educational benefits?"  *Rowley*, 458 U.S. at 206-07; *see also Adam J. ex rel. Robert J.*, 328 F.3d at 809.

### a.   Procedural violations

Plaintiffs contend that SBISD committed numerous procedural violations during and after the April 24, 2014 ARDC meeting, and that those violations impeded their rights to be involved in the development of the IEP, which resulted in the denial of a FAPE for E.R. (Plaintiff's Motion at 3).  Plaintiffs argue that E.R.'s Behavioral Intervention Plan and science

---

[52]  There is no evidence about the qualifications of the teachers or paraprofessionals at Wilchester, so it is not possible to compare those abilities.  As discussed, the preponderance of the evidence shows that Ms. Pye and Mr. Pineda are qualified for their positions in the Life Skills class.  There is no evidence of Ms. Firozgary's qualifications, but Plaintiffs do not question her qualification's to care for E.R.

inclusion were removed without notice.  They complain that they had no input into the description of E.R.'s present academic abilities (the PLAAFP), and the IEP did not describe how E.R.'s disability affects her ability to progress in the general education program. (Plaintiff's Motion at 3).  They insist that the committee failed to advise them of the nature of the speech therapy and occupational therapy offered to E.R., and, specifically, whether it was to be direct or consult therapy, and individual or group therapy.  (Plaintiff's Motion at 4).  The IEP also did not explain what the "allotted 10 minutes of school health services would entail." (Plaintiff's Motion at 5).  Plaintiffs also complain that the IEPs are "wholly inadequate" because they do not offer access to the full range of the general education curriculum that is provided to non-disabled students.[53]

"Procedural defects alone do not constitute a violation of the right to a FAPE unless they result in the loss of an educational opportunity[.]"  *Hovem*, 690 F.3d at 396.  After careful consideration of the procedural violations alleged in this case, it is clear that even if the preparation of the April 24, 2014 IEP was procedurally deficient in some respects, E.R. has not established that those procedural violations caused her to lose an educational opportunity or infringed her parents' opportunity to participate in the IEP process.  On the contrary, Plaintiffs admit that they were present when the IEP was developed, that they communicated repeatedly with SBISD, and that they attended the December, 2014 ARDC meeting to talk about her progress.  See, e.g., *Adam J. ex rel. Robert J.*, 328 F.3d at 812 (citing *Doe v. Defendant I,* 898 F.2d 1186, 1191 (6th Cir.1990)) ("Adequate parental involvement and participation in

---

[53]  While this is really a complaint about the substance of the IEPs, Plaintiffs argue that they were not afforded the opportunity to request an IEP on each strand of the TEKS because the ARDC did not tell them that it was required, so it violates the procedural requirement to collaborate.  (See Plaintiff's Motion at 5-9).

formulating an IEP," not adherence to a "laundry list of items" are the "primary concern in requiring that procedures be strictly followed.").

It is impossible to tell, from the evidence in this case, whether the ARDC explicitly discussed E.R.'s removal from science inclusion and the termination of her Behavioral Intervention Plan at the April, 2014 meeting.  However, even if these topics were not directly discussed, such a procedural violation does not make the IEP insufficient when there is no indication that it actually resulted in the loss of an educational opportunity.  *Hovem*, 690 F.3d at 396.  Here, Plaintiffs have offered no evidence that E.R. benefited from science inclusion, or that she required a behavioral intervention plan.  They have shown only that she had both in the previous school year.

Kelly Miller, an education diagnostician, participated in the April, 2014 ARDC meeting.  (Tr. at 2410, 2413).  Ms. Miller explained that E.R. was removed from science inclusion because "she needed time to work on her IEP goals and objectives, as the pace and rigor of the classroom was too much at that time."  (Tr. at 2444).  Although she could not recall if the removal was explicitly discussed at the ARDC meeting, Ms. Miller said that E.R.'s schedule of services was reviewed and approved by the parents, and it was reflected in the documentation signed by S.R. and K.R.  (Tr. at 2444).  Further, Ms. Pye told E.R.'s parents that she was not in the general science class during the first week of school, but they did not complain about this until the December, 2014 ARDC.[54]  Plaintiffs have not shown that E.R.'s removal from science inclusion resulted in the loss of an educational opportunity.

For the 2014-2015 school year, SBISD believed that E.R. no longer required a Behavioral Intervention Plan.  She had met the goals from the previous year, and the plan was

---

[54]   The complaint was not about the loss of science education, but whether E.R. needed the socialization with her non-disabled peers, a criticism of the substance of the IEP which is discussed further.

removed by the committee.  (Tr. at 2443).  This decision was proven to be a reasonable one, given E.R.'s actual classroom conduct the following school year.  Ms. Pye did not think a behavioral plan was necessary because E.R. responded to redirection in the classroom, and had made a significant improvement in staying on task during the first six weeks of school.  (Tr. at 2659).   Supporting this conclusion, E.R.'s teacher at Briarwood did not need a written Behavioral Intervention Plan for her, and testified that she does not have "maladaptive behaviors that disrupt the learning environment."   (Tr. at 2303 (Testimony of Beverly Brinkmeyer)).   On this evidence, Plaintiffs have not shown that the removal of E.R.'s behavioral plan had any impact on her education at Frostwood, and the preponderance of the evidence supports the conclusion that one is not necessary.

Plaintiffs have also complained that the services for occupational therapy, speech therapy, and health services were not sufficiently described in the IEP.  (Plaintiffs' Motion at 4).  Plaintiffs do not argue that there was a loss of educational opportunity for E.R. because the speech or occupational services were inappropriate or improperly administered at Frostwood. Instead they complain that they were not able to determine if the services were appropriate, because they were not clearly described.[55]  The IDEA requires the IEP to include the projected date for the beginning of services, their anticipated frequency, and their duration.  See 20 U.S.C. § 1414(d)(1)(A)(vi).  In this instance, the IEP describes the frequency, location, and

---

[55]  Plaintiffs also do not complain the services were not provided or that E.R. required more, only that they were not adequately described in the IEP.  (See Plaintiffs' Motion at 4) ("There was no such statement describing the type of speech therapy or occupational therapy being offered to E.R. that would enable her to advance appropriately toward attaining the annual goals.  Without this information, the parents were unable to make any type of decision as to whether the related services being offered were of the type required to assist E.R. to benefit from special education.").

duration of the related services for E.R.[56]  (Tr. at 439).  There is no evidence that the services offered were inappropriate or insufficient, or that they were not actually provided.  Because of that, the preponderance of the evidence shows that SBISD provided a "statement of the special education and related services" for E.R, and then actually provided those services to her.  20 U.S.C. §1414(d)(1)(A)(i)(IV).

Plaintiffs assert a larger, overarching, complaint about the procedural violations in developing the 2014-2015 and 2015-2016 IEPs.  They insist that E.R. is entitled to exposure to all grade level TEKS requirements.  Plaintiffs argue that the IDEA requires that IEPs be developed and designed to meet the child's needs that result from her disability.  (Plaintiffs' Motion at 6).  Plaintiffs insist that IEPs are not limited to critical areas only, but must cover all areas of need.  Because E.R. needs assistance in every subject, the IEP was required to set a goal for every educational requirement for her grade level.  (Plaintiffs' Motion at 6-7).  More importantly, argue Plaintiffs, the ARDC did not describe E.R.'s present ability in each strand for each TEKS subject, so they could not tell which critical needs were to be addressed.  (*Id.* at 8).  Because of this, they contend, they were denied meaningful participation in the overall development of E.R.'s IEP.  (*Id.* at 9).  Plaintiffs concede that the question of whether SBISD "can limit the child's educational program to . . . what they consider 'critical' IEPs that do not address or measure the vast majority of the State standards . . . without any notice, discussion or input from the parents" is one of first impression.  (Plaintiff's Response at 2).

Plaintiffs, bearing the burden of proof, have failed to establish that this was a procedural violation that denied E.R. a FAPE.  They have cited neither case law nor any statutes that

---

[56] E.R. received occupational therapy for thirty minutes, three times during each nine week period in the special education classroom.  She received speech language therapy in the speech therapy room twelve times per nine week period for thirty five minutes each session.  (Tr. at 439).  The remainder of the related services are also described in this format.

require an ARDC to include a goal for each strand of the TEKS in an IEP.[57]   There is no authority that imposes such a requirement.[58]

The goals written for E.R. here focus on the prerequisite skills that she must first learn to progress to the grade level skills described in the TEKS.  (Tr. at 2727-2728).  Plaintiffs do not argue that E.R. can, in fact, learn the grade level TEKS standards that they insist must be included in the IEP.  Instead everyone agrees that E.R. is behind academically and is not able to learn without significant accommodation in the Life Skills class.  (See Plaintiffs' Motion at 12 (describing E.R. as "globally delayed"))(Ms. Pye's testimony, "we would never expect a life skills student to function at grade level or they wouldn't need special ed services."(Tr. at 2695)) (Adina Rich's testimony that E.R. cannot be educated in a mainstream setting "without accommodations, supports, and modification of curriculum." (Tr. at 2571-2572)).  The TEKS for fourth grade students contain 23 strands and 194 standards.[59]   SBISD was not required to prepare a goal for each strand or standard.  Not informing E.R.'s parents about each strand and each standard did not constitute a procedural violation of the IDEA.

---

[57]  The Texas Education Agency's ("TEA") own materials, although not controlling, express its understanding of the implementation of IEPs.  In the Individualized Education Program Annual Goal Development:Question and Answer Document (June 19, 2014), the TEA explains that IEPS are not required to include all TEKS/standards in a subject (2.4), nor are they required to include goals for each tested objective on a state assessment (2.11).  *Available at* http://esc20.net/users/0045/docs/AGC/iepQA61914.pdf.

[58]  Plaintiffs offered the testimony of Adina Rich in support of this contention. Ms. Rich's testimony, when read in its entirety, offers a more limited position, however.  She concedes that there need not be an IEP for each TEKS strand.  She believes, however, that when a student is to take the STAAR-ALT, as E.R. does, there must be an IEP for each area to be tested.  Ms. Rich was unable to point to any authority for that position.  The TEA explains that, while students must have academic standards-based IEPs that correspond to the tested content area on the STAAR-ALT test (2.10), it is not necessary to write a goal for each tested objective.  (2.11).  The ARDC is not required to write an annual goal for every essence statement, but must have goals based on the student's PLAAFP.  (2.14).  See, The Individualized Education Program Annual Goal Development:Question and Answer Document (June 19, 2014), fn. 57.

[59]  For E.R.'s fourth grade year, the English Language Arts and Reading TEKS contained four strands: 1) reading, with 14 standards; 2) writing, with 8 standards; 3) research, with 4 standards; and 4) listening and speaking, with 3 standards.  Mathematics listed 6 strands with 53 standards, Social Studies included 8 strands with 80 standards, and Science listed 5 strands with 32 standards.  See, TEXAS ADMINISTRATION CODE, Section 74, ch. 110-113.

Given E.R.'s parents' active participation in the crafting of her IEPs, the lack of complaints about the substance of the IEP until after E.R. was removed from Frostwood, and the absence of any demonstrable "lost educational opportunity" to E.R., the procedural requirements of the IDEA were substantially satisfied, even if some information may have been omitted from E.R.'s IEP.[60]

### b.   Substantive violations

Plaintiffs next insist that the IEP from April 2014, is substantively deficient because it is not reasonably calculated to provide meaningful educational benefits under the IDEA. (Plaintiffs' Motion at 11-15).   When assessing whether the IEP is "reasonably calculated to enable the child to receive educational benefits," the Fifth Circuit directs courts to consider: 1) whether "the program is individualized on the basis of the student's assessment and performance;" 2) whether the program is implemented in the least restrictive environment ("LRE"); 3) whether the services are coordinated and collaborative; and 4) whether "positive academic and non-academic benefits are demonstrated."   *Michael F.*, 118 F.3d at 253; *see also R.H.,* 607 F.3d at 1012.

### 1)   Individualized Program

The IEP must be designed to meet the particular needs of the student based on the student's assessment and performance, and include "sufficient support services to allow her to benefit from the instruction."   *Adam J. ex rel. Robert J.*, 328 F.3d at 810.   Plaintiffs here argue that the program is not individualized for E.R., because the ARDC did not develop a PLAAFP

---

[60]  Plaintiffs did not complain about the substance of the IEP at the April 2014 ARDC meeting or at the December 2014 ARDC meeting.  The first clear attack on the sufficiency of the IEP and its goals was made in Plaintiffs' request for a due process hearing in February 2015, after E.R. had been moved to Briarwood.  SBISD does not argue the IEPs were perfect, only that, while they may not have met the best practices described by Adina Rich, they were sufficient to provide E.R. a FAPE.  The preponderance of the evidence supports that contention.

describing her present level of performance in each area of need.  (Plaintiffs' Motion at 11-13).

This, according to Plaintiffs, means that any goals in the IEP were not measurable because one

cannot determine if E.R. is making progress without knowing her starting point.  Plaintiffs do

not argue that there are no PLAAFPs reflected in the IEP, instead they argue that the PLAAFPs

are not specific enough, that is, they don't describe E.R.'s grade reading level, and are not tied

to the grade level TEKS.  (Plaintiffs' Motion at 12).

> The IDEA requires that:
>
> [i]n developing each child's IEP, the IEP Team ... shall consider (i) the strengths
> of the child; (ii) the concerns of the parents for enhancing the education of their
> child; (iii) the results of the initial evaluation or most recent evaluation of the
> child; and (iv) the academic, developmental, and functional needs of the child.

20 U.S.C. § 1414(d)(3). In addition, the IDEA requires the IEP to include a "statement of the

child's present levels of academic achievement and functional performance, including how . . .

the child's disability affects the child's involvement and progress in the general education

curriculum. . . ."  *Id.* at § 1414(d)(1)(A)(i)(I)(aa); 300 C.F.R. 300.320(a)(1).

   With these concerns in mind, the court considers the hearing officer's conclusion that

the April 2014 IEP was individualized to E.R.  In developing the 2014-2015 IEP, the ARDC

completed a Review of Existing Evaluation Data ("REED").  (Tr. at 430-434).  Kelly Miller

assessed E.R.'s prior Full and Individual Evaluation, as well as her grades, the data on her class

performance, and the reports from her teacher.  (Tr. at 2418).  E.R.'s teacher described her

abilities in the classroom at the ARDC meeting.  (Tr. at 2419).  Some of E.R.'s strengths and

needs were described in the PLAAFP, and goals were developed by the ARDC committee,

which included E.R.'s parents, based on those needs.  (Tr. at 403-405, 406-415, 2413-2414).

The ARDC created seven academic goals, one functional goal, three motor goals, and one

speech therapy goal based on the information it had for E.R.  (Tr. at 406-415).  The ARDC also identified the related services that E.R. required to allow her to benefit from the educational instruction, including occupational therapy, adaptive health fitness, school health services, and speech and language services.  (Tr. at 424).  The IEP describes the accommodations, program modifications, and time in the resource room to assist E.R.'s learning.  (Tr. at 421).  Plaintiffs' complaints that the PLAAFP is not sufficiently detailed and the goals not measurable, even if true, do not prove this program was not individualized for E.R.  Instead, those arguments challenge the academic benefit of the program, as discussed below.  The preponderance of the evidence supports the hearing officer's conclusion that the IEP was individualized to E.R.'s needs.

### 2)  Least Restrictive Environment

According to the Fifth Circuit, Congress's strong preference for "mainstreaming" students is counterbalanced by the recognition that a general education is not suitable for many disabled students.  *See Daniel R.R.*, 874 F.2d at 1044, 1045.  That tension reflects the IDEA's mandate that each child is to be educated in regular classes only to the maximum extent appropriate.  *R.H.*, 607 F.3d at 1009 (quoting *Daniel R.R.*, 874 F.2d at 1045).

*Daniel R.R.* sets out a two-part analysis to use in determining school compliance with this mandate: 1) "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child;" and 2) if not, "whether the school has mainstreamed the child to the maximum extent appropriate."  *Daniel R.R.*, 874 F.2d at 1048.  To aid in this individualized, fact-specific inquiry, the Fifth Circuit suggests that courts examine, along with any other pertinent factors, 1) the steps taken by a school to accommodate the disabled child in general education; 2) the extent to which the student

receives an educational benefit from general education; and 3) the effect the disabled student has on the general education population. *Id.* at 1048-49.

Here, the question raised by Plaintiffs is whether it was appropriate to remove E.R. from the mainstream science program. (Plaintiff's Motion at 13). As noted, E.R. was removed from the general science class because she could not keep up with the work, even with an aide assisting her at all times. (Tr. at 2444). The ARDC determined that it was more important for E.R. to focus on the IEP and her goals. (Tr. at 2444). E.R. continued to receive mainstream instruction in fine arts. There is no evidence that returning E.R. to the general education classroom for science would be beneficial to her and not disruptive to the classroom. Plaintiffs, in fact, do not directly contend that E.R. received any academic benefit from the mainstream science class that she did not receive in the Life Skills class, only that they should have been consulted.[61] That contention, without more, does not satisfy their burden to show that SBISD failed to provide an education in the least restrictive environment.

### 3) *Coordinated and Collaborative Services*

Coordination and collaboration among the key "stakeholders" is a necessary component of a FAPE. *See R.H.*, 607 F.3d at 1012; *Michael F.,* 118 F.3d at 253. The IDEA contemplates a collaborative process between the district and the parents. *See R.H.*, 607 F.3d at 1008. Plaintiffs argue that they were denied the right to participate in E.R.'s educational placement when she was moved to Frostwood. (Plaintiffs' Motion at 9-11)(arguing that "at a minimum, SBISD refused to or failed to convene an ARD to consider the parents' input or concerns, prior to making a change [to] E.R.'s education placement . . ."). Although an ARDC meeting did not

---

[61] Plaintiffs' complaint is that the removal from mainstream science, with the one-to-one teacher to student ratio in the Life Skills class, affected her socialization skills. There is no evidence, however, that the non-educational benefit of socialization outweighed her inability to keep pace with the rest of the class, when she was also mainstreamed in fine arts.

take place before the move, S.R. did write a three page letter to Deborah Darmer which expressed his concerns.  (Tr. at 1908-1910).  He explained his concern for E.R.'s safety in a new environment and new program with new teachers who were not intimately familiar with his daughter's complex medical condition, personality, affect or demeanor.  (*Id.*).  He then insisted that any move be predicated on the District first consulting with them to assure that the Frostwood Life Skills class was safe for E.R.  (Tr. at 1909).

The right to provide meaningful input is not the right to dictate the outcome.  *White*, 343 F.3d 373 (citing, *Blackmon v. Springfield R–XII Sch. Dist.,* 198 F.3d 648, 656 (8th Cir.1999) (if parents are given the opportunity to participate in the formulation process, the IDEA requirement of meaningful parental input is satisfied even if the parent's disagree with the decision); *Lachman v. Illinois St. Bd. of Educ.,* 852 F.2d 290, 297 (7th Cir. 1988) ("[P]arents, no matter how well-motivated, do not have a right under [the IDEA] to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child.") *cert. denied,* 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988)).  S.R.'s insistence that a transfer not occur without formally consulting the parents is not supported by the IDEA or the Fifth Circuit's application of that statute.  Similarly, SBISD's refusal to move E.R. from Frostwood back to Wilchester during the fall semester, despite S.R.'s repeated demands, did not hamper the parents' ability to provide meaningful input into her educational plans or placement.[62]  Nor did it otherwise violate the IDEA.

---

[62]  S.R. asked Jan Teater to move E.R. in the October 27, 2014 meeting with the other parents.  In the December 10, 2014 ARD meeting, he demanded the school leave open the option of a transfer from Frostwood.

Plaintiffs also complain that the development and implementation of the IEP was made without their collaboration.[63]   (Plaintiffs' Motion at 14).   However, Plaintiffs attended the ARDC meeting on April 24, 2014, and signed the IEP that was developed at that meeting. When S.R. voiced his concerns about a transfer to Frostwood, SBISD moved Ms. Firozgary to address those concerns.   When Plaintiffs complained about the drop off procedure, Frostwood changed the drop off location.   Plaintiffs complained about the quality of the teaching in Ms. Pye's classroom, so Ms. Hall and Ms. Cole monitored the class and found the instruction to be appropriate.   Plaintiffs complained about Ms. Pye's absences and Principal Green developed a plan to have a certified special education teacher familiar with E.R. in the classroom at all times.   Plaintiffs complained about the level of communication with Ms. Pye, but the evidence reflects regular email and texting between them and Ms. Pye.   When Plaintiffs complained of the method of communication, Ms. Pye changed it.   Reviewing the evidence, as a whole, there is a preponderance of evidence to support the hearing officer's determination that the services were provided in a coordinated and collaborative manner.   The fact that S.R. initiated considerable contact with the SBISD staff and was not satisfied with their responses does not show a lack of collaboration.

A further complaint by S.R. must be addressed: he complains that SBISD never responded with a plan to correct the alleged deficiencies after the December 10, 2014 ARDC Meeting.[64]   (Plaintiff's Response at 17).   He correctly points out that almost a month elapsed from the meeting date and his January 5, 2015 letter, yet SBISD never provided a plan to

---

[63]   Plaintiffs argue that the lack of staff training on E.R.'s health plan, the lack of an assigned aide on day one, the teacher's absences, and the silence as to specific levels of achievement in the PLAAFP show a lack of coordination and collaboration.  (Tr. at 14).

[64]   Although not alleged to be a violation of the collaborative process, it merits discussion here.

address his complaints.  Plaintiffs insist that this contributed to the decision to withdraw E.R. from public school.  (*Id.*).  The hearing officer considered this argument in the due process hearing.  (Tr. at 24).  She decided, however, that SBISD's failure to respond by January 5, 2015, did not impede E.R.'s right to a FAPE or significantly impede Plaintiffs' opportunity to participate in the decision making process.  (*Id*).  A preponderance of the evidence supports the hearing officer's decision.

S.R. insisted at the December 10, 2014 meeting that SBISD reconsider the decision not to move E.R. to a different school, if Frostwood did not improve to his satisfaction.[65]  He wanted SBISD to detail a plan for Ms. Pye's absences, and, generally, make the experience more akin to their experience at Wilchester.  When Ms. Pye quit two days later, S.R.'s expectations changed and he believed E.R. would be moved to a different school.[66]  Instead, during the winter break, Principal Green hired a substitute teacher.[67]  (Tr. at 567).  After learning that E.R. would remain at Frostwood, S.R. informed SBISD he was filing a complaint, and a week later he removed her from the school.  Although Plaintiffs insist that the lack of a response over winter break contributed to the decision to remove E.R. from Frostwood, the preponderance of the evidence makes this unlikely.  At the December 10, 2014 meeting, S.R.

---

[65]  S.R.'s statement at the ARDC Meeting was: "I'd like two things.  . . . We are willing to work with Frostwood but it requires an incredible level of engagement.  That includes an analysis of the reality if the teacher needs to be absent any given number of days for all the reasons that are legitimate in the world . . . how are we dealing with it.  How is your daughter individually affected by frequent changes in staffing.  How can we better engage speech and occupational therapy.  How can we make the experience what it was at Wilchester.  But as long as the District tells me . . . we are not going to recognize our mistakes, we are going to tell you the way it is, then that part of me that spends every waking moment fighting for that little girl, says nope, I'm going to make you learn a lesson. . . .  What would be really nice for me, is if the District said, we're keeping options open.  Work with us at Frostwood, and if it doesn't work, for next year, we can look at different things.  That's what I want the District to say."  (Ex. 6 at 57:35-59:45).

[66]  S.R. testified, "And I have to tell you, I remember at that point again thinking: Okay, now the District can say now we have to move the kids back.  We win.  We can prove our point. . . .  The teacher is gone.  Three kids, three kids - -  one, two, three kids, put them back, it's over.  Nope, didn't happen."  (Tr. at 2265).

[67]  Although S.R. complained that this was further evidence of inconsistency in the class, he was not critical of the substitute teacher.  (Tr. at 2337).

demanded an option that SBISD had already rejected: the opportunity to transfer E.R. out of Frostwood.  SBISD's failure to respond more quickly, in light of the Christmas holiday, the changed circumstances caused by Ms. Pye's resignation, and S.R.'s demands, does not show a lack of collaboration or coordination, and it did not impede Plaintiffs' right to collaborate in the development of E.R.'s educational plan.

Reviewing the evidence as a whole, the preponderance of the evidence supports the hearing officer's conclusion that there was sufficient coordination and collaboration among the key stakeholders involved in E.R.'s education, even if it was not to S.R.'s satisfaction.

### 4) *Academic and Non-Academic Benefits*

The IDEA guarantees an appropriate education, not a perfect education, and the benefit conferred upon the student 'must be meaningful' and 'likely to produce progress.'" *Adam J. ex rel. Robert J.*, 328 F.3d at 808-09 (quoting *Michael F.*, 118 F.3d at 248).  The Supreme Court recently explained that an educational program "must be appropriately ambitious in light of [the student's] circumstances." *Endrew*, 137 S.Ct. 988, 1000; 197 L.Ed.2d 335 (2017).  "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created.  This absence of a bright line rule, however, should not be mistaken 'for an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review.'" *Id.*

In this case, Plaintiffs have argued that there was no educational benefit to the Frostwood program, because there is no credible evidence that E.R. made meaningful educational progress while there.  (Plaintiffs Motion at 14, Plaintiffs' Response at 15-19).  Plaintiffs insist that the IEPs at issue in this case were not appropriately ambitious, because they "lacked sufficient underlying data as to her present level of performance and none

addressed her potential for growth." (Plaintiff's Supplemental Brief on the Affects of *Endrew F. ex. rel. Joseph F. v. Douglas County School District, RE-1, to the Proceeding*, Docket No. 31). Plaintiffs contend, instead, that the evidence shows that E.R. stagnated.

The hearing officer found, however, that E.R. demonstrated progress in achieving her goals, and that such progress is consistent with some educational benefit to the program. *See., e.g., Bobby R.*, 200 F.3d at 349 (finding an educational benefit was shown by increased test scores, even if the student could not keep up with the rest of the class). E.R.'s parents are frustrated by their belief that their daughter was moved, in their opinion, to an inferior classroom, against their will. Although those feelings may be understandable, the legal focus in this matter is necessarily narrow. E.R.'s parents must demonstrate that her IEPs were not reasonably calculated to enable her to make progress in light of her circumstances. *Endrew*, 137 at 999.

"Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." *Endrew*, 137 S.Ct. at 999, *citing Rowley*, 458 U.S. at 208-209, 102 S.Ct. at 3051. The ultimate goal is to provide the whole educational experience, adapted in a way to confer benefits on the child. *Hovem*, 690 F.3d at 397. Courts should not lightly disregard educators' decisions on the appropriate educational methods to achieve a FAPE. *Rowley*, 458 U.S. at 204, 102 S.Ct. at 3049. Further, it is not necessary for E.R. to improve in every area to show that her IEP conferred a benefit. *See Bobby R.*, 200 F.3d at 350 (stating "it is not necessary for Caius to improve in every area to obtain an educational benefit from his IEP."). As the party challenging the IEP, the onus is on Plaintiffs to show that it was not appropriately ambitious, because the presumption of the IDEA favors the proposal of the school district. *Salley*, 57 F.3d at 467.

E.R.'s teachers at Wilchester developed an IEP, which they believed would confer an educational benefit to her for the 2014-2015 school year. E.R.'s parents did not object to that IEP at the time of the ARDC meeting. Ms. Pye believed those goals were appropriate, even though they were developed by someone else. (Tr. at 2658). Ms. Hall agreed that the goals were appropriate because E.R. was able to learn the material and progress toward mastering those goals, even though the goals did not always describe E.R.'s starting point. (Tr. at 2735). Ms. Pye assessed E.R.'s abilities at the beginning of the school year, and determined that she had some knowledge of the information contained in the goals, even though she had not yet mastered the goals.[68] (Tr. at 2658-2659). According to Ms. Pye, this supported her belief that the goals were appropriate for E.R. (*Id.*). Even so, Ms. Pye did not limit her instruction to the goals in the IEP, but focused on the academic goals established by the TEA for E.R.'s grade level. (Tr. at 2662). Those academic goals built on the skills learned in prior years. (Tr. at 2663-2664). If E.R. did not know the prerequisite skill, Ms. Pye addressed it in class.[69] (Tr. at 2696). Ms. Pye explained that she adapted the assignments to E.R.'s needs because she required modified instruction in every academic area, and so the grades did not necessarily show how she was doing in a particular subject area. (Tr. at 2676, 2695).

Although Plaintiffs insist that the IEPs were inappropriate and deficient, they have not produced any evidence to show that the goals were too easy, or that E.R. was capable of doing

---

[68] Plaintiffs suggest that some of the goals might have been inappropriate because, E.R. may have already mastered the skill before the school year began. (Tr. at 2746)("Do you know whether or not she was able to do that before –two years ago, for example?"). But E.R.'s history suggests that she needs regular reinforcement of concepts that she has previously learned. (*See, e.g.*, Tr. at 1798-1802).

[69] As an example, Ms. Pye explained that a prerequisite to be able to add money is addition and subtraction. A prerequisite for addition is to understand place values. Even if E.R.'s grade level goal was to understand how to add money, she needed to understand the concept of place values first. Once E.R. mastered place values, the focus would shift to the next prerequisite, and continue until she reached the grade level goal. (Tr. at 2663-2664).

more.[70]  Plaintiffs' expert witness, Adina Rich, agreed that IEP development is based on the "student's need and it is reasonably calculated on how much progress a child can reasonably be expected to make over the course of that coming year."  (Tr. at 2571).  While she criticized the IEP for not describing a baseline for E.R., she did not explain what goals would be appropriate for her instead.  She also did not offer any testimony on the level of progress E.R. could reasonably be expected to make.  Ms. Rich's testimony does not show that the education program for E.R. was not appropriately ambitious.  In this case, it is undisputed that E.R. is unable to learn at grade level in any subject.  She has ADHD and a low IQ, both of which affect her ability to learn.  She is constantly at risk of a life threatening seizure or shunt failure, and this complicates her educational progress.  SBISD prepared an IEP designed to, and that did, in fact, provide an educational benefit to E.R., in light of her disabilities, and the IDEA creates a presumption in favor of that plan.  Plaintiffs have not overcome that presumption.

The hearing officer concluded that the IEPs were sufficient to offer E.R. a FAPE.  The preponderance of the evidence supports that finding.

### 3.      2015-2016 IEP

Plaintiffs next argue that SBISD committed both procedural and substantive violations of the IDEA by failing to convene an ARDC meeting when the April 24, 2014 IEP expired in April, 2015.  Plaintiffs argue that because E.R. was privately placed, due to the denial of a FAPE, and the FAPE claim was pending adjudication, SBISD was required to continue to develop IEPs and offer a FAPE to E.R.  (Plaintiffs Motion at 17) (*citing MM ex rel. DM v. Sch. Dist. of Greenville Cnty*, 303 F.3d 523, 536 (4th Cir. 2002)).  Plaintiffs concede that SBISD's obligation to develop IEPs would end if it was clear that Plaintiffs would reject any offering by

---

[70]  Plaintiffs have argued that the IEP should have developed a goal for each grade level TEKS strand.  However, there is no evidence that E.R. is capable of learning each grade level TEKS strand, and indications that she is not.

the public school system. Plaintiffs argue, however, that they never unequivocally rejected public services, so that SBISD was required to prepare an IEP in April, 2015. (Plaintiffs Motion at 18).

SBISD argues that it was not required to convene an ARDC, because Plaintiffs expressed no interest in returning E.R. to Frostwood. (Defendant's Motion at 24). SBISD also contends that because Briarwood is outside of SBISD's jurisdiction, it was relieved of the duty to hold an ARDC meeting.[71] (Defendant's Motion at 30).

When parents elect to move a student to a private school, the parents assume that financial risk unless they can prove that the local district's IEP was inadequate, the private school was the appropriate placement for the child, and the cost of the private school was reasonable. *Florence County Sch. Dist. Four v. Carter By and Through Carter*, 510 U.S. 7, 12–13, 15–16, 114 S.Ct. 361, 126 L.Ed.2d 284 (1993); *See also, Dallas Indep. Sch. Dist. v. Woody*, 178 F. Supp. 3d 443, 466 (N.D. Tex. 2016). They are entitled to reimbursement *only* if a federal court concludes both, that the public placement violated the IDEA, and that the private school placement was proper under the Act. *Florence Cty. Sch. Dist. Four*, 510 U.S. at 15, 114 S. Ct. 361 (1993). In this instance, as explained throughout, the IEP in place at the time of E.R.'s withdrawal from Frostwood was adequate and afforded her a FAPE. Plaintiffs are not entitled to reimbursement for the placement at Briarwood, because of any deficiencies in the April 24, 2014 IEP.

---

[71] Neither party explains which local education agency covers Briarwood, and the hearing office declined to make a finding in the absence of any evidence. Briarwood is outside of the SBISD zone, at least for the 2015-2016 and 2016-2017 school years. See, SBISD boundary map, found at *https://cms.springbranchisd.com/Portals/370/2015-16_District%20Map_072215.pdf?ver=2015-07-22-093925-877* and *https://cms.springbranchisd.com/Portals/370/sbisd_District_Map_022717.pdf?ver=2017-02-27-121939-530* . Briarwood is located at 12207 Whittington Drive, Houston, Texas and is located next to Ashford Elementary School, which is in the Houston Independent School District.

In regard to the 2015-2016 school year, SBISD convened an ARDC meeting in August 2015, after it received a second notice of placement from Plaintiffs.  An IEP was proposed, and rejected, by S.R. and K.R.  The August 2015 IEP is similar to the IEP that was in place when E.R. was withdrawn from Frostwood.[72]  Plaintiffs' complaints about the substance of this IEP are the same complaints that they made about the April 24, 2014 IEP.  In the same way that the April 24, 2014 IEP was appropriate, the August 20, 2015 IEP is appropriate, as well, and likewise offered E.R. a FAPE for the 2015-2016 school year.

Even so, Plaintiffs argue that Frostwood was required to convene an ARDC meeting when the IEP expired in April, 2015.  (Plaintiff's Motion at 17-19).  Plaintiffs contend that the IDEA requires an ARDC to review each child's IEP "annually, to determine whether the annual goals for the child are being achieved" and that this annual requirement was violated. 20 U.S.C. § 1414(d)(4)(A)(i).  However, SBISD had no responsibility to convene an ARDC meeting after E.R.'s parents had placed her in a private school outside of SBISD's geographic boundaries in January 2015.  *See, e.g.,* 34 C.F.R. § 300.323(a) (requiring each district to have an IEP "for each child with a disability within its jurisdiction."); 34 C.F.R. § 300.132 (giving a district, or Local Educational Agency ("LEA"), obligations with respect to "children with disabilities who are enrolled by their parents in private, including religious, elementary schools and secondary schools located in the school district served by the LEA."); *D.C. v. Klein Indep. Sch. Dist.*, 711 F. Supp. 2d 739, 749–50 (S.D. Tex. 2010) (no responsibility to convene ARD when student moved to private school outside of district).  There is "no obligation to hold an ARDC meeting . . . when [the student's] parents move[] her to a private school outside the

---

[72]  The August 2015 IEP adopted most of the goals from the prior IEP , but reduced the duration to 18 weeks. Since the prior IEP had a duration of 36 weeks and E.R. left Frostwood halfway through the school year, the effect is that the new IEP resumed E.R.'s instruction from the point that she left Frostwood.   The August 2015 IEP did include a few additional goals.

district's jurisdiction." *Klein*, 711 F.Supp.2d at 749-750.  Briarwood is located at 12207 Whittington Drive, Houston, Texas, outside of SBISD.  *See supra*, note 71.

Plaintiffs argue that *Klein* does not govern this case, because a district cannot avoid its obligation to convene an ARDC meeting if a due process request is pending.  (See generally, Plaintiffs' Motion at 17-19, Plaintiff's Response at 3-7).  It is true that the due process complaint in this case was filed before the deadline to hold an ARDC had elapsed, while in *Klein*, the due process complaint was not filed until after the deadline.  *Klein Indep. Sch. Dist.*, 711 F. Supp. 2d at 741-742.  However, that difference does not dictate a different outcome. SBISD's obligation to hold the ARDC meeting is set by the IDEA.  The IDEA requires an ARDC to review each child's IEP "periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved."  20 U.S.C. § 1414(d)(4)(A)(i).  That requirement applies only to children within the boundaries of the school district.  *See, Klein*, 711 F.Supp.2d at 749-50 (citing 34 C.F.R. § 300.323(a) and 34 C.F.R. § 300.132).

Plaintiffs insist that a school district must continue to develop IEPs for a student if a prior year's IEP is under administrative or judicial review.  (Plaintiffs' Motion at 17) (quoting *MM ex rel. DM v Sch. Dist. of Greenville County*, 303 F.3d 523, 536 (4th Cir. 2002)[73] ("A school district is only required to continue developing IEPs for a disabled child no longer attending its schools when a prior year's IEP for the child is under administrative or judicial review." *MM ex rel. DM*, 303 F.3d at 536 (citing *Amann v. Stow Sch. Sys.,* 982 F.2d 644, 651 n. 4 (1st Cir.1992)).  Plaintiffs seize on this language to argue that, because they filed a due

---

[73]  Neither party cites any authority from the Fifth Circuit on this specific issue, and the court has found none. While the legal authority in other circuits can be persuasive, it is not binding.  *United States v. Diamond,* 430 F.2d 688 (5th Cir.1970); see also, *Cooper v. Brookshire*, 880 F. Supp. 481, 483 (W.D. Tex. 1994), *rev'd*, 70 F.3d 377 (5th Cir. 1995).

process claim before the IEP expired, SBISD was required to hold an ARDC and develop an IEP in April 2015.

Even though the Fourth Circuit's reasoning might be persuasive, here it does not compel a different outcome.  The authorities cited by Plaintiffs do not place an absolute duty on a district to continue to prepare IEPs during the pendency of a due process complaint.  There are sound reasons for the district to do so, and the district may be at a disadvantage at a due process hearing if it does not.[74] *See, Amann,* 982 F.2d at 651 n. 4.  As the cases cited by Plaintiffs state, if subsequent IEPs are not prepared, "the losing party in the dispute over the contested IEP ... will have the burden of producing evidence and persuading the court of changed circumstances that render the district court's determination as to the initial year inappropriate for guiding its order of relief for subsequent years."  *MM ex rel. DM*, 303 F.3d at 536–37 (*citing Andersen v. Dist. of Columbia*, 877 F.2d 1018, 1022 (D.C.Cir. 1989)).  Here, SBISD had an IEP in place for the 2015-2016 school year.  That IEP guides this court's decision on the appropriate relief for that year.

Plaintiffs point out that the failure to hold an ARDC meeting in April, 2015, when the prior plan expired, is a procedural violation of the IDEA.  (Plaintiffs' Motion at 19).  There is no evidence that the absence of an IEP from April 24, 2015 through August 27, 2015, however, resulted in the loss of educational opportunities to E.R. during that period.  She was enrolled in

---

[74] The *Amann* court explained that a district should prepare and IEP when a complaint is pending, saying "'that pending review of an earlier IEP, local educational agencies should continue to review and revise IEPs, in accordance with applicable law.'  The review process may take several years, and '[w]ithout an IEP as a starting point, the court [would be] faced with a mere hypothesis of what the Town would have proposed and effectuated during the subsequent years.'"  (citation omitted).

Briarwood during that time, because her parents rejected the FAPE offered at Frostwood, and there was no indication that they were interested in returning her to Frostwood.[75]

The preponderance of the evidence supports the hearing officer's decision that SBISD offered E.R. a FAPE during the 2014-2015 and 2015-2016 school years.  Plaintiffs' removal of E.R., placement in a private school, and near unequivocal rejection of public placement relieved SBISD of the obligation to meet in April 2015 to update E.R.'s IEP.

### 4.      Section 504 and ADA

Plaintiffs' final argument is that SBISD discriminated against E.R. because of her disabilities under § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("§ 504") and the Americans with Disabilities Act, 42 U.S.C. §§ 12102 et seq. ("ADA").  Plaintiffs argue that E.R. was denied the benefits of a full educational curriculum by SBISD's decision to limit her IEPs to critical areas of need.  (Plaintiffs' Motion at 19-20).  Plaintiffs present the claim as one for the denial of benefits, that is, the benefits of a full educational curriculum.  But SBISD is not required to provide a "full educational curriculum" to E.R.  It is obligated to provide a free appropriate public education designed to meet the child's unique needs.  *Michael f. by Barry F*, 118 F.3d at 247, *c.f. Endrew F.*, 137 S.Ct. at 999 (holding that educational opportunity equal to that offered to general students is not required).

The Congressional objective of §504 is the elimination of discrimination against individuals with disabilities."  *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 290–91 (5th Cir.

---

[75]  The parties disagree on whether E.R.'s parents made an unequivocal statement that she was not returning to public school.  S.R. contends his statement, "Whereas this district has never responded to anything they said they were going to respond to, how could you ever expect me to return my daughter to the school," is not a clear statement E.R. would not return, but the hearing officer concluded SBISD was reasonable in believing he rejected a public education for E.R.  The preponderance of the evidence, including S.R.'s demands at the October 27, 2014 meeting with Jan Teater and at the December 10, 2014 ARDC meeting, the substance of the January 5, 2015 letter to SBISD, and the tension between the parents and the District, support this conclusion.

2005) (en banc).   Section 504 mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).   In the school setting, "a cause of action is stated under § 504 when it is alleged that a school district has refused to provide reasonable accommodations for the handicapped plaintiff to receive the full benefits of the school program." *Marvin H. v. Austin Indep. Sch. Dist.*, 714 F.2d 1348, 1356 (5th Cir.1983). Title II of the Americans with Disability Act is also an antidiscrimination statute and the Fifth Circuit "has equated liability standards under § 504 and the ADA." *See, Estate of Lance v. Lewisville Indep. Sch. Dist.,* 743 F.3d 982, 990–92 (5th Cir. 2014).

Section 504's regulations provide that a school district satisfies the FAPE requirement when it provides services "designed to meet individual educational needs of handicapped persons as adequately as the needs of nonhandicapped persons are met." 34 C.F.R. § 104.33(b)(1).  Establishing an IEP under IDEA is one method for a school district to satisfy the substantive § 504 FAPE requirement.   See 34 C.F.R. § 104.33(b)(2) ("Implementation of an [IEP under IDEA] is one means of meeting the standard" for § 504 FAPE); 34 C.F.R. Part 104, App. A to Part 104–Analysis of Final Regulation ("A new § 104.33(b)(2) has been added, which allows this requirement to be met through the full implementation of an individualized education program developed in accordance with the standards of [IDEA].").   Here, SBISD developed an appropriate IEP under the IDEA for E.R.   That IEP satisfies the FAPE requirements of § 504.   While Plaintiffs are correct in pointing out that the ADA and 504 can give rise to claims predicated on theories of liability even when a FAPE has been provided, the only discrimination alleged here is the implementation of the educational plan at issue.   SBISD

was not required to provide E.R. with the "whole range" of educational opportunities available to the general education students, and its failure to do so does not violate the ADA or § 504. *See, e.g., Endrew F.,* 137 S.Ct. at 999.

Plaintiffs' discrimination claims also fail for an additional reason.  Although the IDEA does not "restrict or limit the rights, procedures, and remedies available under . . .the Americans with Disabilities Act of 1990 [or] title V of the Rehabilitation Act of 1973," "before filing a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter."   20 U.S.C. § 1415(1); *L.F. v. Houston Indep. Sch. Dist.,* 2009 WL 3073926, at *22 (S.D. Tex. 2009)("Before bringing a claim for relief under the Rehabilitation Act based on allegations that overlap with the IDEA, a plaintiff must exhaust administrative remedies with the state education agency.").   To determine if there is overlap, the court should consider two questions.  *Reyes v. Manor Independent School District No.* 850 F.3d 251 (5th Cir. 2017) (*citing Fry v. Napoleon Cmty. Sch.,* 137 S.Ct. 743, 197 L.Ed.2d 46 (2017)).   "First, could the plaintiff have brought the same claim if the alleged conduct had occurred at a public facility that was not a school?  Second, could a non-student at the school have brought the same claim?"  *Id., citing Fry,* 137 S.Ct. at 757.  If the answers to both questions are no, the claims overlap with the IDEA claims and must be administratively exhausted.

That is the case here.  E.R. claims discrimination because of the scope of the education she received while attending SBISD's school.  These allegations overlap with the IDEA claims and Plaintiffs were required to first exhaust the administrative remedies for this action.

Because they did not, the discrimination claims would be dismissed, even if they did not fail on the merits.

## VI.  PREPONDERANCE OF EVIDENCE

The controlling question is whether the administrative record establishes that there has been substantial compliance with IDEA's processes and that the child's education needs have been appropriately addressed.  *Seth B.*, 810 F.3d at 967.  There is a presumption in favor of the education plan proposed by the school district, and S.R. and K.R. have the burden to show the school's recommended IEP is inappropriate.  *Salley,* 57 F.3d at 467; *and see Michael F. ex. rel. Barry F*, 118 F.3d at 252.

The court finds that a preponderance of evidence supports the decisions reached by the hearing officer that:

1) The 2014-2015 IEP was appropriate;

2)  The District did not impede the parents' opportunity to participate in the decision-making process;

3)  SBISD provided E.R. a FAPE for the 2014-2015 school year;

4)  SBISD was not required to hold an ARDC meeting in April, 2015;

5)  SBISD offered E.R. a FAPE at the beginning of the 2015-2016 school year;

6)  Plaintiffs are not entitled to reimbursement for the private school placement.

Therefore, the court recommends that the hearing officer's decision be affirmed.

## VII.  CONCLUSION

Based on the foregoing, the court RECOMMENDS that SBISD's motion be **GRANTED** and that Plaintiffs' motion be **DENIED**.

The Clerk of the Court shall send copies of the Memorandum and Recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 02-13, S.D. Texas.  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas, 77208; copies of any such objections shall be delivered to the chambers of Vanessa D. Gilmore, Room 9513, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 15th day of June, 2017.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**